NATIONAL CORN GROWERS ASSOCIATION, New Energy Company of Indiana, Archer Daniels Midland Company, Ohio Farm Bureau Federation and A.E. Staley Manufacturing Company, Plaintiffs,

v.

James A. BAKER III, Secretary, United States Department of the Treasury, John M. Walker, Jr., Assistant Secretary, United States Department of the Treasury, William Von Raab, Commissioner, United States Customs Service, and United States of America, Defendants,

and

Raj Chemicals, Inc., Certified Oil Company and Citicorp International Trading Company, Inc., Intervenor-Defendants.

Court No. 85-08-01151.

United States Court of International Trade.

May 22, 1986.

924

Williams & Connolly (Aubrey M. Daniel, III, Stephen L. Urbanczyk, Manley W. Roberts, Robert W. Hamilton and William R. Murray, Jr.), Washington, D.C., for plaintiffs.

Richard K. Willard, Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, Intern. Trade Field Office, Commercial Litigation Branch (Kenneth N. Wolf), New York City, for defendants, Edward N. Maurer, U.S. Customs Service, of counsel.

McDermott, Will & Emery (Charles R. Work, R. Sarah Compton, Kurt J. Olson, Jacqueline E. Zins, Daniel C. Beckhard and Carolyn K. Weeder), Washington, D.C., for intervenor-defendant RAJ Chemicals, Inc.

Rogers & Wells (Robert V. McIntyre and Roger A. Clark), Washington, D.C., for intervenor-defendant Certified Oil Co.

Wilmer, Cutler & Pickering (A. Douglas Melamed, Robert C. Cassidy, Jr. and Deborah M. Levy), Washington, D.C., for intervenor-defendant Citicorp International Trading Co., Inc.

David L. Armstrong, Atty. Gen. (Frank F. Chuppe, Asst. Deputy Atty. Gen.), Frankfort, Ky., for The Commonwealth of Kentucky, as amicus curiae.

Mayer, Brown & Platt (Charles S. Levy), Washington, D.C., for American Farm Bureau Federation, as amicus curiae, and Hamel & Park (Jerome P. Weiss), Washington, D.C., for Illinois Agricultural Ass'n, as amicus curiae.

D'Amico, Luedtke, Demarest & Golden (William F. Demarest, Jr. and Lizbeth R. Levinson), Washington, D.C., for Citgo Petroleum Corp., as amicus curiae.

### Opinion

AQUILINO, Judge:

The background of this case has been set forth in Judge Carman's opinion, 9 CIT ——–——, Slip Op. 85–98 (Sept. 20, 1985), as well as in opinions of this court[1] deciding various motions, and will be discussed hereinafter only as it relates to necessary findings of fact or conclusions of law.

The plaintiffs and the defendants specify the issues of law essentially as (1) whether the U.S. Customs Service had authority to permit importation of fuel ethanol from Brazil after August 2, 1985 without payment of the full duties prescribed in the Tariff Schedules of the United States and (2) whether Customs Service rulings per-

---

**1.** *See* 9 CIT ——–——, Slip Op. 85–105 (Oct. 9, 1985), and 9 CIT ——, 623 F.Supp. 1262 (Nov. 26, 1985), the latter cited hereinafter as "Slip Op. 85–119".

mitting such importation were arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(1)(A).

## I

The parties also agree that the actions of the defendants complained of are to be measured by the contents of the administrative record. However, the parties do not concur as to what that record entails. Their disagreement stems from defendants' failure to comply with the mandate of 28 U.S.C. § 2635(d)(1), which is:

> In any other civil action in the Court of International Trade in which judicial review is to proceed upon the basis of the record made before an agency, the agency shall, within forty days or within such other period of time as the court may specify, after the date of service of the summons and complaint upon the agency, transmit to the clerk of the court, as prescribed by its rules—
>
> (A) a copy of the contested determination and the findings or report upon which such determination was based;
>
> (B) a copy of any reported hearings or conferences conducted by the agency; and
>
> (C) any documents, comments, or other papers filed by the public, interested parties, or governments with respect to the agency's action.

The summons and complaint were served on August 29, 1985. In the absence of the record (or any application to extend the time for the filing thereof), this court in Slip Op. 85–105 granted plaintiffs' motion for certain discovery of the defendant officials on the authority of *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971), *Texas Steel Company v. Donovan*, 93 F.R.D. 619 (N.D.Tex.1982), *Exxon*

*Corporation v. Department of Energy*, 91 F.R.D. 26, 32–46 (N.D.Tex.1981), *Quincy Oil, Inc. v. Federal Energy Administration*, 468 F.Supp. 383 (D.Mass.1979), and *Gulf Oil Corporation v. Schlesinger*, 465 F.Supp. 913, 916 (E.D.Pa.1979). That discovery included production of documents, responses to interrogatories and presentment for depositions of Deputy Director John T. Roth and Director Harvey Brent Fox of the Classification and Value Division of the Customs Service.

The court scheduled trial of any outstanding issues of fact. Thereafter, counsel for the defendants filed with the Clerk documents claimed to comprise the administrative record. They also interposed on the eve of trial a motion for judgment on that record pursuant to CIT Rule 56.1 and moved for a stay until resolution of their dispositive motion.

 The court denied a stay. The plaintiffs moved to supplement the record with documents, mostly obtained during discovery, and with Roth and Fox deposition testimony; intervenor-defendant RAJ Chemicals, Inc. [hereinafter referred to as "RAJ"] submitted an *in limine* motion to limit the scope of review to the administrative record.[2]

That record was submitted by counsel for the defendants under cover of an affidavit of Mr. Roth wherein he is characterized as having been "involved directly in the decisions"[3] at issue in this case. The affidavit incorporates by reference and attaches a list of documents contained in defendants' response to plaintiffs' request to produce. The list has been marked to indicate which papers produced during discovery are not considered by the defendants to be part of their record and therefore were not filed.

---

**2.** Plaintiffs' motion was denied from the bench as to the documents; the depositions were received. To the extent RAJ's motion implied opposition to any supplementation of the record as filed by the defendants, it was denied. *See* Tr. at 117–18.

**3.** Affidavit of John T. Roth, paras. 3, 4, 5 and 6 (Dec. 2, 1985) [hereinafter cited as "Roth Affidavit"]. The plaintiffs marked this affidavit as their trial Exhibit 1.

Of those papers, plaintiffs' motion to supplement sought admission into evidence of Nos. 12, 59, 60, 71, 79, 105, 107, 116, 117, 120, 122, 123, 124, 125 and 127, as well as three documents [4] not on the government list. The motion stated that the Roth affidavit

> excludes a number of ... documents that were before the agency at the time of the agency decisions, some of which documents were filed with the agency by the public or interested parties and some of which were prepared by the agency and help explain the decisionmaking process.... Since these documents come within the terms of Rule 72(a) and 28 U.S.C. § 2635, they should be included in the Administrative Record.[5]

In addition to 28 U.S.C. § 2635 quoted above, CIT Rule 72(a) provides that

> within 40 days after the service of the summons and complaint upon the agency, the agency shall file with the clerk of the court the items specified in paragraphs (1), (2) and (3) of this subdivision (a), if they exist, and the certified list specified in paragraph (4) of this subdivision (a), as part of the official record of the civil action.
>
> (1) A copy of the contested determination and the findings or report upon which such determination was based.
>
> (2) A copy of any reported hearings or conferences conducted by the agency.
>
> (3) Any documents, comments, or other papers filed by the public, interested parties, or governments with respect to the agency's action. The agency shall identify and file under seal any document, comment, or other

information obtained on a confidential basis, including a nonconfidential description of the nature of such confidential document, comment or information.

> (4) A certified list of all items specified in paragraphs (1), (2) and (3) of this subdivision (a).

For his part, Mr. Roth makes the point several times in his affidavit that he "expanded" [6] paragraph (1) of this rule to supply certain documents as part of the record and that he also included other documents which do "not come within the scope of Rule 72(a)(1), (2) or (3)." [7]

In view of this attitude, and of the dictates of the above-quoted rules of law, it is difficult to discern why a number of documents discovered by the plaintiffs and proffered to supplement the record were not included in the first place. For example, document 71 is a request dated June 27, 1985 for a ruling by the Customs Service as to the duty on fuel ethanol proposed to be imported from Brazil by Citicorp International Trading Company, Inc.[8], and document 79 is a reply thereto on July 15, 1985. Documents 122, 123, 124 and 125 are requests in May and June 1985 for Customs Service rulings on proposed importations of fuel ethanol by RAJ, Valley Green International Trading Corporation and Certified Oil Company [9]. Exhibit 19 is a letter dated July 18, 1985 from RAJ's counsel to Mr. Fox contending that the Service's rulings underlying this case "represent a clear and cogent interpretation of the relevant TSUS items and should not be revoked or modified". On the other hand, plaintiffs' position is much less tenable on other documents, *e.g.*, No. 12 (complaining *ex post*

---

**4.** Marked for identification as plaintiffs' trial Exhibits 17, 18 and 19.

**5.** Memorandum in Support of Plaintiffs' Motion to Supplement the Administrative Record and to Admit Deposition Testimony and Documents Explaining the Agency's Decision, p. 2.

**6.** Roth Affidavit, para. 11, p. 4; para. 12; para. 13, p. 7; and para. 14, p. 8.

**7.** *Id.*, para. 11, p. 5 and para. 13, p. 8.

**8.** On November 26, 1985, the court granted the motion of this company [referred to hereinafter as "Citicorp"] to intervene in this action as a party defendant.

**9.** On October 10, 1985, Certified Oil Company's motion to intervene as a party defendant was granted. On December 9th, its counsel served and filed a "Notice of Withdrawal" and since then has been absent from the case.

*facto* about the ruling revocations through *ex parte* procedures), No. 105 (Customs Service news bulletins after the fact) and Nos. 107 and 116 (attempts by Customs to explain its actions to Senator Robert Dole and then Secretary of Agriculture John R. Block, respectively).

Notwithstanding the varying degrees of apparent relevance of the foregoing documents, they are not part of the administrative record according to the Roth affidavit, *i.e.*, they were not before the decisionmaker at the time of decision. In the face of such a certification, the court is not at liberty to hold otherwise simply on the grounds of production during discovery and relevance, which is all the plaintiffs show. *See generally San Luis Obispo Mothers for Peace v. NRC*, 751 F.2d 1287, 1323–29 (D.C.Cir.1984), *vacated in part on another ground on reh'g en banc*, 760 F.2d 1320 (D.C.Cir.1985); *Star-Kist Foods, Inc. v. United States*, 8 CIT 305 (1984). The court therefore denied plaintiffs' motion as to the documents [10], and, with the limited exception of Exhibit 2, none are relied on hereinafter.

The Administrative Procedure Act and 28 U.S.C. § 2640(d) contemplate the availability of a complete record. However, no record was filed in a timely manner herein, thereby necessitating the independent discovery, which itself gave rise to the format, if not the contents, of the decisionmaker's certification. His affidavit admits that there are no reported hearings or conferences conducted by the agency [11] within the meaning of 28 U.S.C. § 2635(d)(1)(B) and CIT Rule 72(a)(2). Furthermore, Mr. Roth's attempts to "expand" the record notwithstanding, the court is unable to conclude after careful review that it contains either findings or a report of the kind contemplated by subparagraphs (A) and (1) of the foregoing rules as a basis for the administrative actions contested herein.

It has been held that hearings and formal findings are not always necessary to make an administrative record whole. *E.g., Camp v. Pitts*, 411 U.S. 138, 140–41, 93 S.Ct. 1241, 1243, 36 L.Ed.2d 106 (1973) (interpreting the National Bank Act, 12 U.S.C. § 26); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. at 409, 91 S.Ct. at 820 (interpreting the Department of Transportation Act, 49 U.S.C. § 1653(f), and the Federal-Aid Highway Act of 1968, 23 U.S.C. § 138). The Supreme Court recently stated in *Florida Power & Light Co. v. Lorion* :

> If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.[12]

Of course, at the time of plaintiffs' motion to supplement, the court was not in a position to determine the adequacy of the administrative record in view of its last-minute filing along with defendants' motion for judgment thereon. Moreover, contrary to an earlier suggestion by the court that liquidation be suspended pending expedited resolution of the issues raised [13], the defendants (according to letters from their counsel dated November 27 and December 23, 1985) had liquidated two of the contested ethanol entries on November 15 and December 20, 1985, respectively.[14] These

---

**10.** Marked for identification at trial as plaintiffs' Exhibits 2 through 19.

**11.** *See* Roth Affidavit, paras. 11(2), 12(2), 13(2) and 14(2).

**12.** 470 U.S. 729, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643 (1985). *See* 5 K. Davis, Administrative Law Treatise 29:22, at 439 (2d ed. 1984).

**13.** *See* Slip Op. 85–119, 623 F.Supp. at 1271.

**14.** A third letter dated January 14, 1986 states that another entry was liquidated on January 10th.

Finally, defendants' counsel sent a letter to the court dated April 10, 1986 and stating that Customs had notified its field offices on March 24 and 27, 1986 that suspension of liquidation of the four remaining, contested entries herein had been lifted as a result of final negative determinations by the International Trade Commission as to dumping of, and countervailing

maneuvers effectively have made remand upon any determination of record inadequacy inappropriate.

As indicated above, in the absence of the record, the court had granted leave to take the deposition(s) of the decisionmaker(s)[15] on the authority of *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. at 420, 91 S.Ct. at 825 (Where there are no formal findings, "it may be that the only way there can be effective judicial review is by examining the decisionmakers themselves"). *See Public Power Council v. Johnson*, 674 F.2d 791, 793–94 (9th Cir. 1982); *Environmental Defense Fund, Inc. v. Costle*, 657 F.2d 275, 285 (D.C.Cir.1981); *Hurst v. United States Postal Service*, 586 F.2d 1197, 1200 n. 6 (8th Cir.1978). As the Supreme Court stated in *Camp v. Pitts*, 411 U.S. at 142–43, 93 S.Ct. at 1244:

> If ... there was such a failure to explain administrative action as to frustrate effective judicial review, the remedy was ... to obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary.

Having granted this remedy under the rare circumstances indicated, it would indeed be anomalous and not in the interests of effective judicial review for the court now not to receive and consider the deposition testimony of the decisionmakers along with the documents which they thereafter claim constitute their record.

## II

From the outset, the defendants challenged the standing of the plaintiffs to prosecute this case. That challenge was overruled by Judge Carman during hearing and determination of plaintiffs' original application for a preliminary injunction. *See* Slip Op. 85–98 at 4. Then, on further consideration of defendants' motion to dismiss the complaint, joined in by RAJ, this court, taking the allegations of the complaint as true for purposes of deciding the motion, denied dismissal on the ground of lack of standing. *See* Slip Op. 85–119, 623 F.Supp. at 1264–66. Finally, the trial itself focused on this issue.

The intervenor-defendants argue vigorously in their post-trial briefs that the plaintiffs failed to carry their burden of proof on the question. This position is not well-taken, however, as to two of the plaintiffs.

A. *Standing of Plaintiff Archer Daniels Midland Company ("ADM")*

▪ ADM, which is the largest domestic producer[16] of anhydrous ethyl alcohol or ethanol[17], operates plants in Peoria and

---

duties on, Brazilian fuel ethanol. *Compare* note 37 *infra with* 51 Fed.Reg. 9538 (March 19, 1986).

**15.** Presumably, the examinations were based upon the documents produced during discovery, both those claimed now to comprise the record and those sought by the plaintiffs to be added thereto.

**16.** *See, e.g.,* transcript of deposition on December 10, 1985 of Edward A. Harjehausen [hereinafter cited as "Harjehausen Deposition"], pp. 112–14, 134–35.

**17.** The intended use of this product is both as an "extender" and an octane "enhancer" of gasoline [*see, e.g., id.* at 148–49], ergo the vernacular "fuel ethanol" and "gasohol". This use, however, is not new:

> Ethyl alcohol has been used for many years as a motor fuel when blended with gasoline, particularly in Europe. From 5 to 20 percent anhydrous alcohol is used in commercial blends. Alcohol has an octane number of 99 and a higher heat of vaporization than gasoline, both of which are technologically desirable. Despite alcohol having only two-thirds the calorific value of gasoline, blends of up to about 15 percent alcohol provide slightly more power and lower fuel consumption than straight gasoline. This anomaly is explained on the basis of a higher fuel/air ratio for the alcohol blend. In countries that imposed compulsory mixing, gasoline/alcohol blends were not readily acceptable by the public. However, gasoline/alcohol/benzene blends were acceptable, as indicated by experience in France with a blend consisting of 75 percent gasoline, 15 percent alcohol, and 10 percent benzene.

Marks' Standard Handbook for Mechanical Engineers at 7–20 (8th ed. 1978). One witness estimated that in 1985 "5 to 7 percent of the

Decatur, Illinois and Cedar Rapids and Clinton, Iowa. *See* Tr. at 55. Almost all of this product is derived from corn [18], with ADM attempting to sell the resultant fuel ethanol to petroleum marketers across the United States—from Minnesota to Florida to California.[19]

A document in the administrative record herein describes the status of fuel ethanol in this country as follows:

United States fuel ethanol sales find their modern origins in the oil supply disruptions and price escalations associated with the Arab oil crisis of the 1970's and the tax subsidies (both Federal and State) that began in 1978. Fuel ethanol and certain other gasoline extenders were promoted to lessen the likelihood that United States consumers would be held hostage in the future. Although OPEC's threat has subsided and the rate of growth of gasoline demand has lessened, fuel ethanol demand has been sustained in the 1980's, and likely in the future, by domestic rather than foreign policy. The adoption of the catalytic converter in the Clean Air Act of 1970 effectively required that new automobiles sold in the United States burn unleaded gasoline. This resulted in both increased demand for such gasoline and for sources of non-lead octane enhancers.

Fuel ethanol, in addition to being a gasoline extender, is a significant source of octane. Fuel ethanol supplies were encouraged by tax credits granted under the Windfall Profits Tax legislation of 1980. Thus, through public policy affecting both the demand side and the supply side, U.S. fuel ethanol sales (U.S. apparent consumption) have grown from under 10 million gallons in 1978 to over 531 million gallons per year in 1984 (of which 430 million were produced domestically). Continued growth in U.S. sales has been further assured by recent EPA rulings that require the lowering of the lead content of leaded gasoline production from 1.1 grams per gallon (gpg) to 0.5 gpg by July 1, 1985 and to 0.1 gpg by January, 1986. Based on the most recent estimates, that nevertheless predates [*sic*] the EPA's lead reduction edict, fuel ethanol sales are expected to rise by 15 percent for the year 1986 to 678 million gallons.[20]

For years, there has been analysis of motorfuel use in the United States on a regional or PADD ("Petroleum Administration for Defense District") basis. Florida, for example, is in PADD–I, which experienced a 93 percent increase in fuel ethanol sales from January 1984 to January 1985.[21] California, which experienced "sharp declines" in ethanol sales for the same period [22], is part of PADD–V.

For its part, ADM's sales in Florida for the first half of 1985 "averaged around 3 million gallons a month."[23] Sales for the second half of last year declined markedly.[24] More specifically, Citgo Petroleum

---

gasoline in this country contain[ed] ethanol." Harjehausen Deposition, p. 130.

**18.** The Peoria plant has also processed some rye, milo and corn screenings. *See* Harjehausen Deposition, p. 115.

**19.** *See, e.g.,* Tr. at 58 and Harjehausen Deposition, pp. 70, 75, 163 and 165.

**20.** Record Document ("RD") 44 (Glassman-Oliver Economic Consultants, Inc., *The Effect of Additional Supplies of Fuel Ethanol on U.S. Producers and Consumers* at 3–4 (footnotes omitted)).

The final rule of the Environmental Protection Agency as to gasoline lead content is set forth at 50 Fed.Reg. 9386 *et seq.* (March 7, 1985). *See also* 50 Fed.Reg. 13,116 *et seq.* (April 2, 1985) (banking of lead rights).

**21.** *See* RD 44 (Alcohol Update, *Ethanol Blend Market Share Jumps in January* at 4).

**22.** *Id.*

**23.** Harjehausen Deposition, p. 194. *See* Tr. at 239, 250. Most of the evidence in this case was adduced under a protective order agreed to by the parties. The court respects the desirability of confidentiality and therefore refers herein only to specific data produced in confidence as is minimally necessary to make this opinion intelligible.

**24.** *See* Harjehausen Deposition at 195; Tr. at 250.

Corporation [25] was an important customer of ADM during the first half of 1985 in Florida [26] and in other states. Indeed, ADM maintains a terminal for distribution of ethanol to Florida (and elsewhere) at Avondale, Louisiana. ADM's subsidiary American River Transportation Company chartered a large, oceangoing barge with a capacity of approximately 55,000 barrels at a rate of $4,200.00 per day "to improve [ADM's] service to [its] Florida customers" [27], including Citgo, starting in April 1985.

Nevertheless, soon thereafter the barge was subchartered because ADM "couldn't get consistent business" for it in Florida. ADM's vice-president of marketing, Edward A. Harjehausen, testified as follows as to the company's loss of business from Citgo:

Q. Did you sell product to Citgo after the month of May?

A. No, we didn't.

Q. Did you make effort to sell them product after the month of May?

A. Yes, we did.

Q. In what months did you make efforts to sell the product for use in Florida?

A. We offered to sell them product in June, July and in August.

Q. And did you sell them product?

A. No, we didn't sell them anything.

Q. Did you have an understanding as to why not?

A. Well, I am not sure why not. There was an indication that our pricing wasn't attractive. There was an indication that he didn't really need any. I cannot honestly say we pinned down a specific reason why.

Q. Did you quote a price?

A. Yes.

Q. Was the price different in any material respect from the price that you had been quoting in the previous months?

A. No.

**25.** Referred to hereinafter as "Citgo". After the court had set this case down for trial, Citgo filed a motion for leave to intervene as a party defendant, stating, among other things:

Citgo is a large independent refiner and major producer of gasoline and gasohol fuels. In conjunction with its parent company, The Southland Corporation, Citgo markets gasohol in twenty (20) states through Citgo and 7–Eleven branded outlets. Together, Southland and Citgo are one of the largest domestic marketers of gasohol in the nation with 1985 sales of gasohol estimated to exceed 800 million gallons....

During June and July 1985 respectively, Citgo entered into two contracts for the purchase of Brazilian ethanol from importer Southern Missouri Oil Company.... Southern Missouri was a recipient of a Custom Service letter ruling to the effect that the 60 cent per gallon duty imposed by item 901.50 of the ... (TSUS) did not apply to certain alcohol mixtures. Subsequently, Southern Missouri received a letter from the Customs Service revoking the prior rulings. This revocation letter also contained a "grandfather" provision challenged by plaintiffs in this action. This grandfather provision permitted certain limited previously contracted quantities of alcohol mixtures classifiable under TSUS item 432.10 to enter the United States prior to 5:00 p.m. November 1, 1985 exempt from the 60 cent per gallon duty imposed on ethyl alcohol under item 901.50, TSUS.

Pursuant to this provision, Southern Missouri entered two shipments of ethanol mixtures during the weekend of October 26–27, 1985 without liability for the 60 cent per gallon duty imposed by TSUS item 901.50. Once entered, the imported mixtures were immediately sold to Citgo. Citgo has agreed to indemnify Southern Missouri for certain increased duties for which Southern Missouri might become legally liable as a result of this lawsuit.

Memorandum in Support of Motion of Citgo Petroleum Corporation for Leave to Intervene, pp. 1–3.

At trial, the court denied this motion to intervene, whereupon Citgo moved for reconsideration, stating in its motion, among other things, that "Citgo is not a holder of a revoked letter ruling nor a holder of one of the grandfather rulings which are the subject of this litigation" and that "Citgo is not an importer of record". This latter motion was denied in an order dated January 6, 1986, which also granted Citgo's motion to exclude from the case the transcript of plaintiffs' deposition on December 12, 1985 of the company's general manager of industrial products and special products.

Thereafter, the court granted Citgo's motion for leave to file a brief as *amicus curiae*.

**26.** *See* Tr. at 243. *Cf. id.* at 56–57.

**27.** *Id.* at 242.

Q. There was a change in the tax incentive in July in Florida, isn't that correct?

A. Yes there was.

Q. Did you change your price as a result of that change in the tax incentive?

A. No. We felt that the ethanol sold in the Florida market prior to the tax change was undervalued, and that when the tax change came into play, we didn't feel that the overall economics warranted a price change, so we made no price change.

Q. Did the change in the Florida tax incentive change your desire to sell product in the State of Florida?

A. No.

Q. Did it change the volume that you wanted to sell or try to sell or desire to sell in Florida?

A. No.

Q. Did it change your price?

A. No.[28]

This testimony was adduced in rebuttal to that of Citicorp's expert witness [29], who sought to analyze the economics of ADM's loss in Florida of some 1.5 million gallons [30] of ethanol sales per month during the last half of 1985. ADM had made a "conscious decision to sell less product in the Florida market" because it "did not want to run into head-to-head competition with ethanol-toluene blends." [31] In essence, this witness, John G. Reilly, concluded that ADM's decision was "economically justifiable" [32] and "rational" [33]. He sought to support this conclusion by projecting the profitability of a diversion of 1.5 million gallons of ethanol per month from Florida to Minnesota, Illinois and Kansas.[34]

However, Mr. Reilly did not know the average "net-back" to ADM from ethanol sales in Florida or in the other three states. *See* Tr. at 158. He admitted that whatever price differentials may have existed between the two areas had not "triggered any action" [35] on ADM's part to remove product from Florida at least up until June 1985. Mr. Reilly agreed that a basic economic principle or truism operating herein is that more supply in a given market will result in downward pressure on pricing,[36] and he also was aware that Citgo had purchased approximately 18.5 million gallons of fuel ethanol from Southern Missouri Oil Company [37] at a price substantially below

28. *Id.* at 246–47.

29. *See generally id.* at 143–92.

30. *See, e.g., id.* at 250; Harjehausen Deposition, pp. 194–95.

31. Harjehausen Deposition, p. 91. *See also* Tr., p. 60. Mr. Harjehausen testified at trial that his company determined in September-October 1985 to reduce the amount of ethanol for sale in Florida. *See id.* at 64. Citicorp called Citgo's counsel to the stand who offered hearsay testimony to the effect that that decision had been reached in April. *See id.* at 193. This testimony was not corroborated by Citgo's manager of special fuels, Jack Woersching, under examination by counsel for Citicorp and for the plaintiffs. *See generally id.* at 328–34.

What the evidence shows, and the court finds, is that a meeting between Messrs. Harjehausen, Woersching and others took place on April 9, 1985 at which time a commitment was sought for the purchase from ADM of Citgo's "entire requirement in Florida" [*id.* at 339] for a period of six to twelve months. No such agreement was reached, and Citgo purchases of fuel etha-

nol from its "traditional supplier"—ADM—[*id.* at 333] ceased soon thereafter.

32. *Tr.* at 168.

33. *Id.* at 172, 183.

34. *Compare* Citicorp trial Exhibit 2 *with* Tr. at 149–54.

35. Tr. at 163.

36. *See id.* at 166, 170, 185.

37. Hereinafter referred to as "Southern Missouri". This alcohol was landed in Louisiana in October 1985 from two ships, as shown in Slip Op. 85–119, 623 F.Supp. at 1270. As also shown in that opinion, 623 F.Supp. at 1269–70, liquidation of those entries was suspended per force of an ITA preliminary determination of likely sale in the United States at less than fair value. *See also* plaintiffs' trial Exhibit 20 (USITC Pub. No. 1678 (preliminary ITC determination that "there is reasonable indication that an industry in the United States is threatened with material injury by reason of imports from Brazil of certain ethyl alcohol") (April 1985)).

that of ADM.[38] Finally, Mr. Reilly, who testified that for several months he had been conducting a study in connection with the ITC injury investigation of fuel ethanol from Brazil, conceded an awareness of continuing ADM sales in Florida, albeit not to its erstwhile most important customer, Citgo. *See id.* at 188.

In the face of such evidence of loss of business in the largest market for gasohol[39], the intervenor-defendants cling to their position that ADM has failed to demonstrate that it has standing in this case because it

> has failed to demonstrate that it has been "injured in fact" by the Service's decision to grandfather a limited amount of mixtures.[40]

In *Allen v. Wright*, 468 U.S. 737, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984), the Supreme Court stated that

> the constitutional component of standing doctrine incorporates concepts concededly not susceptible of precise definition. The injury alleged must be, for example, " 'distinct and palpable,' " *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 100 [99 S.Ct. 1601, 1608, 60 L.Ed.2d 66] (1979) (quoting *Warth v. Seldin, supra* [422 U.S. 490], at 501 [95 S.Ct. 2197 at 2206, 45 L.Ed.2d 343 (1975) ] ), and not "abstract" or "conjectural" or "hypothetical," *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 [103 S.Ct. 1660, 1665, 75 L.Ed.2d 675] (1983); *O'Shea v. Littleton*, 414 U.S. 488, 494 [94 S.Ct. 669, 675, 38 L.Ed.2d 674] (1974). The injury must be "fairly" traceable to the challenged action, and relief from the injury must be "likely" to follow from a favorable decision. See *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. [26], at 38, 41 [96 S.Ct. 1917, at 1924, 1925, 48 L.Ed.2d 450 (1976) ]. These terms cannot be defined so as to make application of

the constitutional standing requirement a mechanical exercise.

Years earlier, a government claim of lack of standing on the part of Students Challenging Regulatory Agency Procedure, suing under the APA, 5 U.S.C. § 702, to enjoin ICC orders permitting railroad rate increases had been rejected by the Court as follows:

> The Government urges us to limit standing to those who have been "significantly" affected by agency action. But, even if we could begin to define what such a test would mean, we think it fundamentally misconceived. "Injury in fact" reflects the statutory requirement that a person be "adversely affected" or "aggrieved," and it serves to distinguish a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem. We have allowed important interests to be vindicated by plaintiffs with no more at stake in the outcome of an action than a fraction of a vote, see *Baker v. Carr*, 369 U.S. 186 [82 S.Ct. 691, 7 L.Ed.2d 663 (1962) ]; a $5 fine and costs, see *McGowan v. Maryland*, 366 U.S. 420 [81 S.Ct. 1101, 6 L.Ed.2d 393 (1961) ]; and a $1.50 poll tax, *Harper v. Virginia Bd. of Elections*, 383 U.S. 663 [86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) ]. While these cases were not dealing specifically with § 10 of the APA, we see no reason to adopt a more restrictive interpretation of "adversely affected" or "aggrieved." As Professor Davis has put it: "The basic idea that comes out in numerous cases is that an identifiable trifle is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation." Davis, Standing: Taxpayers and Others, 35 U.Chi.L.Rev. 601, 613. See also K. Da-

---

**38.** *See* Tr. at 168 and *compare id. and id.* at 169–70, 171, 185 *with id.* at 261. Citgo's manager of special fuels estimated that this supply of ethanol would fulfill the company's needs in Florida until the end of March 1986. *See id.* at 319.

**39.** *See* Tr. at 305–06.

**40.** Intervenor-Defendant RAJ Chemicals, Inc.'s Post-Trial Brief and Memorandum in Support of Motion for Judgment on the Record [hereinafter cited as "RAJ Post-Trial Brief"], p. 24. *See also* Trial Brief of Citicorp, pp. 64–67.

vis, Administrative Law Treatise §§ 22.-09–5, 22.09–6 (Supp.1970).[41]

RAJ's emphasis on ADM's size and market share is misplaced[42], just as is Citicorp's theory that ADM profited by determining to sell elsewhere the product it could not market in Florida.[43] Indeed, as shown in the analysis of the ethanol market in California *infra*, ADM's size and concomitant ability to deliver its product anywhere in the United States support, rather than undermine, its standing. As for the ADM sales in Minnesota and elsewhere in PADD–II, plaintiffs' expert witness testified:

> My opinion is that the facts presented today by Mr. Reilly have no bearing on whether or not there was harm to ADM as a result of an influx of Brazilian Ethanol into Florida. Tr. at 215.

Further:

> There is no question in economic theory or in what evidence I have seen admitted that there was harmful effect because of the influx of Brazilian ethanol into the Florida market on ADM and other marketers in that area. *Id.* at 216.

> \* \* \* \* \* \*

> Whatever the conditions are in Florida, if you bring in additional supply, whatever they were before, if an additional supply comes in, standard economic analysis tells you the price of ethanol will fall. . . .

Anybody in Florida holding ethanol at the time of the increased availability and the subsequent reduction of price will suffer harm. *Id.* at 217.

The court agrees with this analysis. The record herein amply shows, and the court so finds, that ADM suffered injury in the Florida market sufficient to prosecute this case to judgment. The test, as the Supreme Court indicated in *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), is the existence of "an *injury* of *any* kind, economic or otherwise". 454 U.S. at 486, 102 S.Ct. at 766 (emphasis in original).

If economics is "an inexact science in which emotions play a big role"[44], then a loss of good will in Florida might alone be enough to satisfy the injury-of-any-kind test. But much more has been proven here. In addition to the loss of the 1.5 million gallons of business a month discussed above, the evidence also shows, and the court finds, that ADM ended 1985 with higher inventories of ethanol and fewer customers.[45]

■ The intervenor-defendants emphasize the deposition testimony, read into the record at trial, of the president of The Ethanol Corporation [46], James Bruce Smith,

**41.** *United States v. SCRAP,* 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1973).

**42.** *See* RAJ Post-Trial Brief, pp. 24–25.

**43.** *See* Trial Brief of Citicorp, p. 66.

**44.** P. Samuelson, Economics, An Introductory Analysis, p. 9 (3d ed. 1955). Indeed, Mr. Harjehausen testified that ADM is able to sell in the ethanol market place at prices higher than those of its competition. *See* Tr. at 251.

**45.** *See* Harjehausen Deposition, pp. 155, 159.

**46.** This company has been a customer of both ADM and plaintiff A.E. Staley Manufacturing Company [hereinafter referred to as "A.E. Staley" or "Staley"] in the Florida market and elsewhere in PADD–I.

At the close of his presentation on January 6, 1986, Citicorp's counsel moved, to the extent

necessary, the admission into evidence of testimony on plaintiffs' application for a preliminary injunction on September 13, 1985, which included that of an expert, Donald L. Martin, who had been called by RAJ.

In calling Mr. Smith as a rebuttal witness at trial, plaintiffs' counsel announced that Mr. Smith would rebut the testimony of Mr. Martin [Tr. at 262], primarily in regard to the fuel ethanol market in North Carolina. Counsel for RAJ and Citicorp both objected that this proffer was not proper rebuttal, and the court sustained the objection in view of CIT Rule 65(a)(2) and the trial record before it. The court reserved judgment on the objections of both intervenor-defendants to plaintiffs' offer of Exhibit 23 into evidence. *See* Tr. at 280–84.

That document, which is a letter from Mr. Smith to Mr. Harjehausen dated August 16, 1985 and discussing the ethanol market in North Carolina, apparently had been an attachment to an affidavit of Mr. Smith dated September 11, 1985

that the fuel ethanol market "had already been slaughtered in Florida before ET got there." [47] He attributed this to three factors—increased competition, bad publicity, and the reduced state tax exemption, with the competition characterized as the biggest factor. *See* Tr. at 296–98. Indeed, on August 5, 1983, the Caribbean Basin Economic Recovery Act, 19 U.S.C. § 2701 *et seq.*, became law. Section 2701 empowers the President to "proclaim duty-free treatment for all eligible articles from any beneficiary country" in that geographic region. *Cf.* 19 U.S.C. § 2702(b). Apparently pursuant to this authority, Customs has twice ruled that fuel ethanol from the area can enter this country, including Florida, duty free.[48] In any event, Mr. Smith testified that a principal competitor was marketing ethanol which had entered entirely duty free, as well as at the five percent *ad valorem* rate at issue herein. *Cf.* Tr. at 298–99. In other words, the biggest cause of the "slaughter" of the Florida market was fuel ethanol not subjected to the surcharge (now 60 cents) prescribed by item 901.50, TSUS.

The defendants and RAJ argued in support of their original motions to dismiss that this case was moot, and intervenor-defendants' position now is also based on timing. That is, even if the determinations of the Customs Service to permit entry of Caribbean and Brazilian fuel ethanol without payment of the surcharge killed the market for the domestic product in Florida, that destruction had occurred prior to the Service's August actions complained of herein.

This position has some merit, but not enough to justify the relief requested by the defense because the court finds that the harm to ADM in Florida, which began before August 1985, has continued well beyond that time. For example, Citgo's manager of special fuels estimated at trial that he had enough of the Brazilian product to satisfy his company's entire need for fuel ethanol in Florida for a number of months. *See* Tr. at 319. In fact, the residue of the two Southern Missouri shipments has been stored in Louisiana, with Citgo using the same oceangoing barge earlier chartered and then released by ADM for the transport of this Brazilian

---

[plaintiffs' Exhibit Z] which he had brought to New York in anticipation of testifying in open court on September 13th. Mr. Smith did not testify, nor were the affidavit and letter received in evidence by the court. *See* transcript of proceedings on Sept. 13, 1985 [hereinafter cited as "Sept. 13 Tr."], p. 164. Furthermore, while Mr. Martin, during his testimony, made mention of North Carolina several times, that state's situation was hardly central to his thesis of absence of irreparable harm based on a continental United States market. *See generally id.* at 132–55.

Post-trial briefs for both sides continue the argument on admissibility of this document. The court points out in response to this argument that, while its rulings from the bench as to the scope of Mr. Smith's rebuttal testimony must stand and intervenor-defendants' objections to admission of Exhibit 23 therefore must be sustained, that letter is part of the administrative record herein. *See* RD 88.

Also at the close of his case on January 6th, Citicorp's counsel offered into evidence excerpts of the transcripts of the depositions of one Alfred C. Kellogg on December 12 and Gary Towne on December 13, 1985. The plaintiffs objected at that time, and they object now, to

these proffers. The objection as to Mr. Towne, who is not an officer, director or managing agent of A.E. Staley within the meaning of CIT Rule 30(b)(4) (or Rule 32(a)(4)) and who appeared for deposition pursuant to a notice thereof specifically naming him, was sustained by the court from the bench. *See* Tr. at 198. That ruling stands.

As for Mr. Kellogg, who is counsel to Citicorp's Global Trade Division in New York City, there was and is no showing that he meets any of the conditions of CIT Rule 32(a)(3), hence plaintiffs' objection is hereby sustained, and no part of either his deposition transcript or Mr. Towne's transcript is otherwise referred to or relied on by the court in this opinion.

**47.** Tr. at 291. The reference "ET" is to ethanol toluene, the primary fuel ethanol mixture at issue in this case.

**48.** *See* 50 Fed.Reg. 14250–51 (April 11, 1985). *Cf.* Presidential Proclamation 5452 of March 31, 1986 to "Withdraw Preferential Treatment Under the Generalized System of Preferences for Certain Ethanol Mixtures", 51 Fed.Reg. 11539 *et seq.* (April 4, 1986).

alcohol to Florida.[49] Furthermore, the April 10, 1986 letter from defendants' counsel indicates that the duties on those two entries, as well as on the once-suspended Citicorp entries, have yet to be liquidated.

■ In denying the motions to dismiss on the ground of mootness in Slip Op. 85–119, the court, without the benefit of a timely-filed administrative record or the evidence thereafter adduced at trial, relied on the "capable-of-repetition, yet-evading-review" doctrine as set forth in *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975), and other cases. The first requisite element had already been met by the date of that opinion, to wit, the challenged action of the Customs Service was too short in its duration (90 days) to be fully litigated prior to its expiration. With regard to the second requirement (existence of "a reasonable expectation that the same complaining party would be subjected to the same action again"), the court was unable to conclude then that such an expectation was out of the question.

Having now reviewed the agency record, as well as the evidence on plaintiffs' standing, the court concludes not only that such a reasonable expectation continues to exist but also that there has been no abatement in the controversies between the plaintiffs and defendants over the Customs Service's authority not to liquidate any unliquidated fuel ethanol entries herein at the rate prescribed by item 901.50, TSUS and between the plaintiffs and intervenor-defendants as to the importers' obligations to remit the unpaid duties.

■ As shown in Slip Op. 85–119, 623 F.Supp. at 1270, RAJ imported some 6.03 million gallons of fuel ethanol into the California market in September 1985. Its counsel characterizes ADM's claim of inju-ry in that market as a result of this shipment as "pure nonsense" on the ground that "ADM abandoned the California market in May 1985".[50] This characterization misses the mark, however.

The evidence shows, and the court finds, that ADM sold sizeable quantities of fuel ethanol in California in April and May 1985. *See* Tr. at 62. ADM sold additional product in California in December 1985. *See id.* ADM's vice-president of marketing testified to continuing "talk ... to customers around the country"[51], one of which had been RAJ's September California customer, Beacon Oil Company[52], and he testified at trial that ADM's sales efforts were not limited to any particular geographic area of the United States. *See* Tr. at 55. In short, the court finds that ADM did not "abandon" the California market in 1985, notwithstanding the "sharp declines" in overall ethanol sales at the start of that year noted in the RAJ record document quoted above, page 931, nor does the record support a finding that ADM was incapable of delivering product to Beacon in September 1985. What the record does show is that RAJ's sale price to Beacon then was significantly lower than ADM's sale prices both before and after September to its other California customer[53], which itself was the recipient of a RAJ commission on the sale to Beacon. *See id.* at 132. To imply that this price differential, based in part on the contested 5% *ad valorem* duty[54], could not and did not harm ADM in such a way as to confer standing to prosecute this case is to turn both economics and the law askance.

**B.** *Standing of Plaintiff A.E. Staley*

■ The defense claims of lack of standing on the part of plaintiff A.E. Staley are also unpersuasive. This company produces

**49.** *Compare* Tr. at 239 with *id.* at 318. By comparison, ADM has continued to make available (and sell) ethanol to Citgo in other markets. *See* Harjehausen Deposition, p. 194.

**50.** RAJ Reply Brief, p. 7.

**51.** Harjehausen Deposition, p. 163.

**52.** *Compare Tr.* at 132 (RAJ "had not sold any product to Beacon in the past") *with* Harjehausen Deposition, p. 168.

**53.** *Compare* Tr. at 133 *with id.* at 62, 63.

**54.** *Cf.* Tr. at 133.

annually millions of gallons of fuel ethanol and attempts to market its product, as well as that acquired from others, in PADD–I, including Florida and North Carolina.

Staley's vice-president and general manager of its ethanol business unit, W. Robert Schwandt, testified, and this court finds, that entry of fuel ethanol into PADD–I in 1985 without payment of the duty prescribed by item 901.50, TSUS resulted in an absolute loss of business on the part of the company. *See* Sept. 13 Tr., p. 85. *See also id.* at 87. Indeed, in North Carolina, Staley's sales dropped by more than 90 percent from June to July, and they have remained at a low level since then [55] due to an inability to compete with "non-duty paid alcohol" [56]. The company's offer price in that state during the late autumn, 1985 was some 30 cents per gallon higher than that offered by others.[57]

Staley considers Florida to be "very important". Schwandt Deposition, p. 77. In June-July 1985, its sales of fuel ethanol there exceeded a million gallons. *See id.* at 75, 77. By the time of the trial, monthly sales in that state had also suffered "severe deterioration" due to "much lower price elsewhere." Tr. at 45.

As with ADM *supra,* the intervenor-defendants argue that Staley's lost business is not sufficient to confer standing. Both RAJ and Citicorp contend again that whatever harm Staley suffered in 1985 occurred prior to the "grandfathered imports in September and October". Reply Brief of Citicorp, p. 26. While the court agrees that the harm to Staley began before those particular entries, the court also finds that

those Citicorp entries into PADD–I added to that harm thereafter. Not only had Staley's sales in North Carolina fallen towards zero by the time trial began in December [58], but Mr. Schwandt earlier had described one aspect of this harm as follows:

Q. ... Does the importation of ethanol toluene blends into PAD [*sic*] 1 constitute a viable threat of serious harm to A.E. Staley that could not be undone?

A. Yes

Judge Carman: How?

[A] It has already specifically caused us to lose business and the margin attached to that business. We can't recover that. Furthermore, it has raised a question of credibility in the minds of our customers to what is the real cost and value of this product. So, when we go back, if we get an opportunity to go back, our job will be more difficult.

Judge Carman: So, its [*sic*] a potential of loss of goodwill with customers and the loss of revenue that gives you the irreparable harm?

[A] Yes.[59]

As indicated in Section A above, such a negative turning of customers might alone be enough to satisfy the standing standard enunciated in *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. at 486, 102 S.Ct. at 766.

The intervenor-defendants also point to the fact that Staley's manufacture of fuel ethanol has not been diminished. *See, e.g.,* Tr. at 46. Indeed, the evidence

---

55. *Compare* Tr. at 44 *with id.* at 45, 49. At the time of trial, the company's sales in North Carolina in December were none. *See id.* at 49.

56. Sept. 13 Tr., p. 92. *Cf.* transcript of deposition on December 13, 1985 of W. Robert Schwandt [hereinafter cited as "Schwandt Deposition"], p. 62.

57. *Compare* Tr. at 45 *and* Schwandt Deposition, p. 80 *with* Tr. at 287.

58. *See* Tr. at 49. The intervenor-defendants attempt to attribute this dearth of sales to North Carolina's elimination of its state tax incentive. There can be little doubt that this changed cir-

cumstance had a negative impact on fuel ethanol sales in the state [*cf. id.* at 44 and Plaintiffs' Post-Trial Brief, p. 20], but the EPA rule on gasoline lead content referred to above, page 931 and n. 20, assures ethanol of a role as a substitute octane enhancer in North Carolina, as elsewhere, and it is this market, at a minimum, which Staley is still attempting to compete in [*see* Schwandt Deposition, pp. 80–81]—without much success due to customer expectations of cheaper imports.

59. Sept. 13 Tr., pp. 87–88.

indicates injury to the "merchandise side" of the business. *Id.* That is, the company's lost sales have been of product produced by others (and sought to be marketed by Staley) rather than by its own Tennessee plant. RAJ's argument, for example, is that

> the interest asserted by Staley in this litigation—that of a merchandiser of ethanol from foreign and domestic sources—is not within the zone of interest protected or regulated by the relevant statute.... For that reason alone, Staley does not have standing to pursue this action and its claims for relief should be denied.[60]

The relevant statute implied is item 901.-50, TSUS. The brief of Citgo, as *amicus curiae*, argues at page 9 that this tariff was not designed to protect the domestic ethanol industry, that is, "[i]t is a revenue measure pure and simple." *Id.*, p. 8. RAJ's Post-Trial Brief, on the other hand, states (at pages 32–33):

> The additional duty in item 901.50 TSUS offsets certain tax benefits that accrue from the use of ethanol in motor fuel. (*See* 26 U.S.C. §§ 40; 4081) and in effect eliminates these benefits in the case of imported fuel ethanol. *See* 126 Conf.Rec. S.31709 (December 3, 1980) (statement of Senator Bellman); 126 Cong.Rec. H.11691 (December 3, 1980) (Statement of Representative Ullman). In turn, the tax benefits arising from the use of ethanol in motor fuel are designed to encourage the domestic production of this alternative to petroleum-based fuels. *See* Senate Rep. No. 95–529, 95th Cong., 2d Sess. 45, *reprinted in* 1978 U.S. CODE CONG & AD.NEWS 7981. Thus, item 901.50, TSUS, coupled with the tax subsidies provided in 26 U.S.C. §§ 40, 4081, affords a competitive price advantage to domestically produced ethanol and as such protects domestic producers of fuel grade ethanol by assuring that only domestically produced product benefits fully from the federal tax incentives. *See also* 126 Cong.Rec. S.153147 (December 3, 1980) (statement of Senator Dole).

The RAJ analysis is sounder on the intent and effect of the tariff [61], but it is not enough to support the proposed conclusion that Staley's injury is outside the zone of interest to be protected. While the evidence indicates that Staley itself has sought to sell imported Brazilian ethanol [62], that evidence also shows, and the court finds, that this plaintiff purchased millions of gallons of domestically-produced fuel ethanol for resale in North Carolina, Florida and elsewhere in 1985, including during the time of the entries disputed herein. *See generally* Schwandt Deposition, pp. 32–34.

From the outset of this case, RAJ has sided with the defendants in their position that the plaintiffs were required to protest pursuant to 19 U.S.C. § 1516. This position was overruled in Slip. Op. 85–119, but it is useful to note that that section of the Tariff Act itself confers standing on merchandisers such as Staley. Furthermore, the plaintiffs were not required to pursue such a protest because of the nature of the controversy herein and the relief requested, including a declaratory judgment. When this relief is requested, the Supreme Court has stated:

> ... Basically, the question in each case is whether the facts alleged, under all circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.[63]

---

**60.** RAJ Reply Brief, p. 13.

**61.** The court notes in passing that, while the revenues raised by the tariff are no doubt sizeable (at least when the Customs Service deigns to enforce it), import duties have long ceased constituting a primary source of revenue for the treasury of the United States.

**62.** *See* Schwandt Deposition, p. 32.

**63.** *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941), cited with continued approval in *City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983).

The facts adduced in this case show, and the court concludes, that plaintiff A.E. Staley Manufacturing Company meets the standing requirements.

## C. Lack of Standing of Other Plaintiffs

■ Plaintiffs' complaint on its face was sufficient to withstand a motion to dismiss. However, as the Court noted in *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 115 n. 31, 99 S.Ct. 1601, 1616 n. 31, 60 L.Ed.2d 66 (1979):

Although standing generally is a matter dealt with at the earliest stages of litigation, usually on the pleadings, it sometimes remains to be seen whether the factual allegations of the complaint necessary for standing will be supported adequately by the evidence adduced at trial.

Plaintiffs' proof is inadequate to support standing now on the part of the National Corn Growers Association, New Energy Company of Indiana and the Ohio Farm Bureau Federation, Inc. Indeed, at trial counsel entered a stipulation to the effect that the New Energy Company does not now sell, nor has it ever sold, fuel ethanol in either PADD–I or California and that it is

unable to identify in any way in which it has been injured by the importation of 44 million gallons of ethanol toluene blends during the 90 day grandfather period at issue in this case. Tr. at 102.

■ As for the Ohio Farm Bureau Federation, Inc., the evidence shows that it is a trade representative of some 90,000 people and that it owns Ohio Farm Bureau Synfuels, Inc., which has a 20 percent interest in South Point Ethanol, a producer of fuel ethanol from corn.

South Point considers the State of Maryland an "attractive" potential market in view of its proximity to the company's plant. *See* Tr. at 85. It sold some ethanol in that state in 1985 [64], and it determined to attempt to market larger quantities there. To this end, a sizeable storage tank and some rail cars were leased for a year. But these steps were taken without any contractual commitment to purchase South Point's ethanol. *See id.* at 84. And there was testimony to the effect that it is "almost impossible" [65] to blend gasohol in Maryland due to "volatility standards". *See id.* at 126. In other words, South Point, which was selling elsewhere all the ethanol it produced anyway [66], was looking to engender "new demand" in that state. *See* Tr. at 84. The hoped-for customer had been working with RAJ in an attempt to develop an appropriate gasohol blend for Maryland. But RAJ had not sold fuel ethanol to that company [67], thereby leaving plaintiffs' counsel to contend now that the RAJ entry in California without payment of the item 901.50 duty enables RAJ to "compete more aggressively" in Maryland. Plaintiffs' Post-Trial Brief, p. 31, n. 30. If the best proof of such aggressiveness is price, injury to the Ohio Farm Bureau Federation, Inc. has not been established since South Point's proposed ethanol price was but a penny more a gallon than that of RAJ [68], which differential evaporates with the South Point testimony that the hoped-for customer prefers domestically-produced ethanol. *See* Tr. at 75.

In sum, the evidence fails to substantiate standing on the part of plaintiff Ohio Farm Bureau Federation, Inc., and the same is true for plaintiff National Corn Growers Association.

■ This latter organization was characterized at trial as a "non-profit, non-partisan association designed to benefit and represent the corn growers of this country on issues of importance to them". *Id.* at 88. It has some 17,000 members and 19 sup-

---

64. *See* Tr. at 80.

65. *Id.* at 127.

66. *See id.* at 84.

67. *See id.* at 126, 128.

68. *Compare id.* at 75 *with* transcript of deposition on December 13, 1985 of RAJ president Maulik Radia [hereinafter cited as "Radia Deposition"], p. 35.

porting members, including ADM and A.E. Staley.[69] The testimony of its witness, however, failed to prove injury either to itself or to its corn-growing members caused by the actions of the defendants complained of herein. Rather, the evidence simply reflects a generalized concern for the continued expansion of domestic production of ethanol derived from home-grown corn. *See id.* at 88–95.

The Supreme Court has held that a trade association like that of the corn growers does have standing to bring suit on behalf of its members when:

> (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). Earlier, in *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975), the Court had pointed out that "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members." However, proof of harm to one or more of those individual members is required to justify any relief. *See* 422 U.S. at 515, 95 S.Ct. at 2213.

That proof of harm to individual growers of corn has not been adduced here[70], that is, there is no showing that *Hunt* condition (a), *supra,* is met. Rather, plaintiffs' counsel argue now that the Association has standing based on the injury to nonvoting, "supporting members" ADM and A.E. Staley. But neither of these corporations is a corn grower, nor are their interests necessarily coincident with those of American corn farmers. For example, ethanol can be, and is, derived from other grains. And those raw materials are also subject to importation. In short, the court is unable to conclude that the proven harm to ADM and A.E. Staley is sufficient to sustain the continued presence in this case of plaintiff National Corn Growers Association simply on the ground of payment of dues. *Cf. Health Research Group v. Kennedy,* 82 F.R.D. 21, 27–28 (D.D.C.1979).

### III

◼ The defendants argue in their post-trial brief that the plaintiffs have not shown that whatever injury in fact they suffered was caused by the activities of the Customs Service. This argument is not well-taken; the court finds that injury to plaintiffs ADM and A.E. Staley described above fairly can be traced to defendants' determinations to permit more than 40 million gallons of fuel ethanol from Brazil to enter the United States during September and October 1985 for distribution and sale in PADD–I and California without payment of the duties prescribed by item 901.50, TSUS.[71]

Of course, in their motion for judgment on the agency record, submitted on the eve of trial, the defendants contend that their actions "were lawfully done", to quote from page 4 of their memorandum of law. However, just as the facts do not support the thesis of defendants' post-trial brief, neither does the law support their pre-trial position. Indeed, the best indicator of this is their own determination reached by August 1985 that they had been wrong to "impl[y to RAJ, Citicorp and other importers] that the duty of 60 cents per gallon

---

**69.** Such supporting members, however, do not have a vote, nor are they eligible to be directors of the association. Rather, they pay dues and provide financial and other assistance to the organization. *See* Tr. at 99–100.

**70.** The administrative record contains a letter to Mr. Fox from the Association dated August 16, 1985 [RD 10] which attempts to quantify the harm to U.S. corn farmers to be caused by two

of the contested Brazilian shipments, albeit in a general way and based upon a number of unsubstantiated assumptions.

**71.** In Slip Op. 85–98, p. 4, Judge Carman determined the difference between this duty and 5% *ad valorem* to be approximately 58 cents per gallon.

provided for in item 901.50, TSUS, would not apply." [72] That is, to quote further from this revocation letter to RAJ:

> Upon review of this matter we conclude that the 60 cents per gallon duty should be applied to the ethyl alcohol component of this mixture when the mixture is imported for fuel use, *inasmuch as the language of item 901.50 encompasses all ethyl alcohol, provided for in item 427.88, which is imported for fuel use, whether it is imported by itself or in a mixture.* RD 16 (emphasis added).

The administrative record contains a lengthy document [RD 114] prepared by The Brazilian Ethanol Producers' Special Committee on the export potential of fuel ethanol and which computes an "additional availability of 250 million gallons yearly for export [to the United States], beginning in 1985." The United States ambassador to Brazil sent the following letter dated July 5, 1984 [RD 94] to the defendant Commissioner of Customs:

> Recently my Senior Commercial Officer, Mr. Emilio Iodice, and I met with Shegeaki Ueki, the president of the Brazilian state petroleum company Petrobras. Among the subjects we discussed was the tariff treatment of Brazilian anhydrous alcohol exported to the U.S.
>
> Because of the lack of foreign exchange due to growing debt service requirements, Brazil has become a world leader in the substitution of fuel alcohol for gasoline in automobiles. Unfortunately (from Brazil's perspective), the very high U.S. tariffs on alcohol have greatly limited exports of Brazilian alcohol to the U.S.
>
> As you can see from Mr. Ueki's note, Petrobras is interested in obtaining a favorable tariff ruling on the importation of anhydrous alcohol that is pre-blended with additives such as MTBE, BTX and others. According to Mr. Ueki, the product would be used as an additive to gasoline. What the Brazilians are interested in is finding some formula to export a product of alcohol, but which is different enough to qualify for a lower tariff rate.
>
> In view of the bad news they are about to get on alcohol in the Congress and from the States of California and Florida, a positive response on this subject would elicit a most positive reaction on the part of the Brazilians. It would serve somewhat to mitigate what has been considered here a growing protectionism stance on our part.
>
> I realize that you do not normally involve yourself in details like this, but I would appreciate your help in seeing that Mr. Ueki's letter gets to the right office in Customs. After the ruling is made, I would be happy to transmit it to Mr. Ueki....

Customs responded favorably to this plea on September 12, 1984, concluding that item 901.50, TSUS would not be applied.[73] Predictably, this resolution to disregard the plain meaning of this law engendered protests from domestic interests such as those now plaintiffs in this case [74] and inquiries from members of Congress. For example, Senators Robert Dole and Richard G. Lugar sent a letter to Secretary Baker on July 17, 1985, stating, among other things:

> We are concerned about certain recent Customs Service letter rulings pertaining to the importation of certain so-called mixtures of ethanol with various other petroleum based additives. These rulings effectively contravene Congressional intent. Unless they are immediately revoked, there will be a substantial loss of revenue to the U.S. Treasury and a threat to the economic viability of a major new U.S. industry.
>
> The clear intent of Congress was to impose a special duty on imported fuel ethanol in order to offset corresponding

---

**72.** RD 16 (letter from Harvey B. Fox to Maulik H. Radia stamped August 2, 1985). *See* RD 3, RD 7, RD 23, RD 40 and RD 91.

**73.** *See* RD 94 (letter from Arthur P. Schifflin to Hon. Diego C. Asencio).

**74.** *See, e.g.,* RD 78 (letter from Stephen L. Urbanczyk, Esq. to Harvey B. Fox (July 3, 1985)).

U.S. tax exemptions for the sale of ethanol/gasoline blends. The current amount of this duty is 60¢ per gallon plus a 3% ad valorem tax. These letter rulings permit a defacto [sic] repeal of this duty if the imported ethanol is simply mixed with as little as 7% toluene or other similar additive. RD 98.

Recipients of the "letter rulings" referred to included RAJ, Citicorp, Certified Oil Company and Southern Missouri. With the exception of Southern Missouri, those letters were sent in June 1985. *See* RD's 20, 84. In fact, Citicorp's brief states that

Citicorp had been exploring the possibility of importing mixtures containing ethanol since late 1984 and entered into an agreement with Petrobras in May 1985 to import a small quantity of an ethanol/toluene mixture. It imported 2.2 million gallons of this ethanol/toluene mixture, which was entered in July 1985. This was a "trial lot" (called "CitiChem I") which Citicorp sold to its customer, Chemical Fuels Corporation. The mixture imported in July consisted of 92.5 percent Brazilian ethanol and 7.5 percent toluene. Although *the Customs Service had not issued a ruling letter to Citicorp specifically for this shipment* Citicorp believed, and Customs agreed, that the ethanol/toluene mixture was not dutiable under TSUS 901.50 because the Customs Service had so ruled such in other cases: ... Citicorp was entitled to rely on those rulings. . . . [75]

Trial run or not, Customs issued revocation letters to Citicorp and the other proposed importers on or about August 2, 1985 [76], conditioned as follows:

This revocation is made pursuant to section 177.9(d)(1), Customs Regulations, and is effective with respect to all entries made after 5:00 pm local time, August 2, 1985. Entries made prior to that time will be governed by the ruling previously issued to you. With respect to any entries made after the effective date of the instant ruling, Customs will consider all facts and evidence submitted by you in connection with claims of reliance on the ruling previously issued you.

The issue [77] raised by this decision, as phrased by defendants at page 3 of their memorandum, is whether the Customs Service had authority to permit the importation of ethanol blends beyond August 2, 1985, without the payment of duties at the rate provided for under item 901.50, TSUS, following issuance of the foregoing revocation rulings. The court concludes that the answer to this question is that Customs did not have such authority.

As Justice Holmes once stated on behalf of a unanimous Supreme Court, "there is no canon against using common sense in construing laws as saying what they obviously mean." *Roschen v. Ward,* 279 U.S. 337, 339, 49 S.Ct. 336, 73 L.Ed. 722 (1929). Another unanimous [78] Court, in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), noted that:

The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. . . . If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that

---

**75.** Trial Brief of Citicorp, p. 6, n. 12 (citations omitted; emphasis added). Apparently, RAJ brought a shipment of fuel ethanol into Houston. The testimony thereon is unclear as to whether it arrived pursuant to a prior Customs letter, but, in any event, it was subjected to a duty of 5% *ad valorem* prior to the Customs revocation letter of August 2, 1985 at issue herein. *See* Radia Deposition, p. 13.

**76.** *See supra* n. 72. The letter to Southern Missouri [RD 40] is stamped August 7, 1985, and its

effective date is stated to be that date as opposed to August 2nd.

**77.** Defendants' Memorandum of Law lists as its first issue whether a cause of action lies against them. Slip Op. 85–119 determined that causes do lie, the remedies for which are discussed hereinafter in Point V.

**78.** Justices Marshall, Rehnquist and O'Connor took no part in the decision. *See* 467 U.S. at 866, 104 S.Ct. at 2794.

intention is the law and must be given effect. 467 U.S. at 843 n. 9, 104 S.Ct. at 2782 (citations omitted).

Here, once the defendants had come to admit their erroneous disregard of the law, they opted for a course called reliance between the Scylla and Charybdis of their own creation. This choice compounded their error. Indeed, the ruminations at pages 8–9 of their memorandum of law are revealing, to wit:

Within its judgment and discretion, the Customs Service could have implemented the substance of its August 2 (and 7), 1985 revocation decision(s) in several ways. It could have advised the recipients that it intended to revoke the earlier favorable rulings 90 days hence (*i.e.* on November 1, 1985), thereby providing 90 days notice (and perhaps permitting a flood of imports). Alternatively, the Customs Service could have done nothing and on November 1, 1985, revoked the rulings without notice (thereby potentially injuring importers and domestic purchasers). Additionally, the Customs Service might have implemented the revocations of August 2 and 7, 1985, in modified form by providing for a longer (or shorter) "grace period." Alternatively, the Customs Service could have declined to act on plaintiffs' request (RD Nos. 78 and 134) for administrative reconsideration of its original rulings (*i.e.*, the ones revoked by the August 2 and 7 rulings) and compelled plaintiffs to initiate formal proceedings pursuant to the provisions of 19 U.S.C. § 1516. Finally, the Customs Service could have determined that a uniform and established practice existed (if investigation had permitted such a finding), thereby permitting importation of ethanol blends without the duties provided for under item 901.50, TSUS, until 30 (or 90) days following publication of the notice in the Federal Register.... [footnote omitted]

Expediency, however, having once failed the defendants, is not the correct guidepost—notwithstanding the validity of much that surrounds this presentation in their memorandum. For example, no one disputes 19 U.S.C. § 3's grant to the Secretary of the Treasury of the "superintendence of the collection of the duties on imports as he shall judge best" or the power to promulgate rules and regulations encompassed in 19 U.S.C. § 1624 or the authority to prescribe forms of entries found in 19 U.S.C. § 66. But whatever the breadth of such statutory parameters, they do not accommodate defendants' actions in this case.

Sections 1624 and 66 of Title 19 are claimed to be *pari materia* [79], which makes the general powers set forth therein subject to the restraint "not inconsistent with law." The law here (item 901.50, TSUS) provides:

Ethyl alcohol (provided for in item 427.-88, part 2D, schedule 4) when imported to be used in producing a mixture of gasoline and alcohol or a mixture of a special fuel and alcohol for use as a fuel, or when imported to be used otherwise as fuel ..... 60¢ per gal.[80]

There is nothing in the record before the court to indicate that between the time of this item's enactment in 1980 and 1984 the defendants had difficulty with either its plain meaning or its enforcement. Moreover, whatever uncertainty may have developed thereafter was laid to rest at the start of August 1985, as quoted above, page 942. In fact, the defendants have left the intervenor-defendants to contend now that "TSUS 901.50 was not intended to apply to mixtures" [81], which, in the view of these importers, are properly classified under item 432.10, TSUS.[82] But this position

---

**79.** *See* Defendants' Memorandum of Law, p. 10, n. 11.

**80.** Unless the context indicates otherwise, the court's references in this opinion to this item 901.50, TSUS encompass, necessarily, item 427.-88.

**81.** Trial Brief of Citicorp, p. 39.

**82.** *See generally id.* at 40–43; RAJ Post-Trial Brief, pp. 51–55. The court notes in passing that the prescribed rate of duty for this item is "5% ad val., but not less than the highest rate applicable to any component compound." The

glosses over the intended *use* of the Brazilian ethanol, namely, mixed with gasoline [83] to fuel motor vehicles, which brings it within the ambit of item 901.50. If the intent were otherwise, each gallon could be subjected to the distilled spirits tax prescribed by 26 U.S.C. § 5001(a)(1), depending on the degree of denaturement by substances like the aromatic hydrocarbon toluene. That is, toluene is added to ethyl alcohol to avoid this tax, and not that of item 901.50. *Cf.* 26 U.S.C. § 5214(a)(1)(c).

■ The defendants attempt to rely on 19 U.S.C. § 1315(d), which provides, in pertinent part:

No administrative ruling resulting in the imposition of a higher rate of duty or charge than the Secretary of the Treasury shall find to have been applicable to imported merchandise under an established and uniform practice shall be effective with respect to articles entered for consumption or withdrawn . from warehouse for consumption prior to the expiration of thirty days after the date of publication in the Federal Register of notice of such ruling; ...

But defendants' own revocation letters in this case [RD 3, 7, 16, 23, 40, and 91] deny the existence of any "established and uniform practice", and no publication of their decision(s) to revoke therefore occurred. In short, Section 1315(d), with its 30-day grace period, is inapposite.

The defendants opted for a period of 90 days from the date of their revocation(s), and their counsel refer the court to the Customs Service's general-ruling-procedure regulations, specifically, 19 C.F.R. § 177.-10(e). However, that regulation, covering effective dates of published decisions, provides for immediate application of rulings, except that

a change of practice resulting in the assessment of a higher rate of duty or increased duties shall be effective only as to merchandise entered for consumption or withdrawn from warehouse for consumption on or after the 90th day after publication of the change in the FEDERAL REGISTER.

The defendants admit, however, that their "revocation does not constitute a change in practice warranting publication" [84], and they therefore cannot rely on the time period of this regulation.

■ Finally, the defendants seek support in 19 U.S.C. § 1514(c)(2), but the 90-day period in that section of the Tariff Act of 1930 is the amount of time permitted for the filing of a protest of decisions within the purview of subsection (a) thereof. Nothing in that statutory section contemplates the kind of time lapse at issue here.

The Supreme Court has stated in *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. at 415, 91 S.Ct. at 823, and other cases, that decisions of a cabinet Secretary are entitled to a presumption of regularity, but the Court also has pointed out that the "presumption is not to shield his action from a thorough, probing, in-depth review."

Such a review in this case shows a clear-cut attempt by the defendants not to apply the correct rate of duty prospectively, albeit limited to a period of 90 days. While their own regulation on the effect of a revocation of the kind at issue here, 19 C.F.R. § 177.9(d)(2), proscribes retroactive

mixture referred to in the Customs correspondence with Citicorp dated June 12, 1985 contemplated 92.5% ethanol; the mixture specified in the letter to RAJ dated June 3, 1985 was 89–92.5% ethanol, the rest benzene, toluene or xylene. Hence, that prescription, on its face, brings item 427.88, and thus item 901.50, into account.

**83.** Under Formula No. 20 of the Treasury Department's Bureau of Alcohol, Tobacco and Firearms, 27 C.F.R. 21.24, denaturing ethyl alcohol with unleaded gasoline restricts it to fuel use.

**84.** Defendants' Memorandum of Law, p. 15, n. 15. The other sections of Part 177 of the Service's regulations cited in this memorandum, to wit, 19 C.F.R. 177.0, 177.1, 177.9(a), 177.9(c), 177.9(d)(1) and 177.9(d)(2), do not support defendants' position, nor do they support the position of the intervenor-defendants.

application[85], it does not provide for a prospective non-enforcement of the proper duty. Of course, if it did so provide, the regulation could run afoul of the longstanding rule that the Secretary of the Treasury cannot, by his regulations, alter or amend a revenue law. *See, e.g., Morrill v. Jones,* 16 Otto 466, 467, 106 U.S. 466, 467, 1 S.Ct. 423, 424, 27 L.Ed. 267 (1883); *Czarnikow-Rionda Company v. United States,* 60 CCPA 6, 9, C.A.D. 1071, 468 F.2d 211, 214 (1972). In any event, there is no such regulation, nor is there any statute protecting defendants' conduct in this case. As the Supreme Court stated as long ago as 1836:

> The Secretary of the Treasury is bound by the law, and although in the exercise of his discretion he may adopt necessary forms and modes of giving effect to the law, yet, neither he nor those who act under him, can dispense with, or alter any of its provisions.[86]

This principle remains just as true today. *E.g., Chemung County v. Dole,* 781 F.2d 963, 968 (2d Cir.1986) ("Government agencies are not at liberty to violate statutory commands").

## IV

 The foregoing conclusion of the court that the defendants acted in excess of their statutory authority obviates a need to review the importer claims of reliance presented to the Customs Service. However, review of those claims, pressed now by the intervenor importers before the court, further reveals the unlawfulness of defendants' actions.

In *Bowman Transportation, Inc. v. Arkansas—Best Freight System, Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974), the Supreme Court summarized the appropriate scope of judicial review under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)[87], as follows:

> Under the "arbitrary and capricious" standard the scope of review is a narrow one. A reviewing court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park v. Volpe, supra,* at 416 [91 S.Ct. at 824]. The agency must articulate a "rational connection between the facts found and the choice made." *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 [83 S.Ct. 239, 246, 9 L.Ed.2d 207] (1962). While we may not supply a reasoned basis for the agency's action that the agency itself has not given, *SEC v. Chenery Corp.,* 332 U.S. 194, 196 [67 S.Ct. 1575, 1577, 91 L.Ed. 1995] (1947), we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. *Colorado Interstate Gas Co. v. FPC,* 324 U.S. 581, 595 [65 S.Ct. 829, 836, 89 L.Ed. 1206] (1945).

In this case, the agency's governing regulation, 19 C.F.R. § 177.9(d), which Customs relied on in issuing its revocation letters on August 2 (and 7), 1985, states:

> *Modification or revocation of ruling letters—(1) Generally.* Any ruling letter found to be in error or not in accordance with the current views of the Customs Service may be modified or revoked. Modification or revocation of a ruling letter shall be effected by Customs Headquarters by giving notice to the person to whom the ruling letter was addressed and, where circumstances war-

---

**85.** Presumably, this is why the revocation letters [*see supra* p. 943] state that "[e]ntries made prior to that time [5 p.m. on Aug. 2, 1985] will be governed by the ruling previously issued to you" and also why those entries are not now challenged by the plaintiffs.

**86.** *Tracy v. Swartwout,* 10 Pet. 80, 35 U.S. 80, 95, 9 L.Ed. 354 (1836).

**87.** The Customs Courts Act of 1980, 28 U.S.C. 2640(d), requires this court to review a case such as this under Section 706.

rant, by the publication of a notice or other statement in the Customs Bulletin.

(2) *Effect of modification or revocation of ruling letters.* The modification or revocation of a ruling letter will not be applied retroactively with respect to the person to whom the ruling was issued, or to any person directly involved in the transaction to which that ruling related, *Provided:*

(i) The request for a ruling contained no misstatement or omission of material facts,

(ii) The facts subsequently developed are not materially different from the facts on which the ruling was based,

(iii) There has been no change in the applicable law,

(iv) The ruling was originally issued with respect to a prospective transaction, and

(v) All of the parties involved in the transaction acted in good faith in reliance upon the ruling and retroactive modification or revocation would be to their detriment.

Nothing in this paragraph will prohibit the retroactive modification or revocation of a ruling with respect to a transaction which was not prospective at the time the ruling was issued, inasmuch as such a transaction was not entered into in

reliance on a ruling from the Headquarters Office or the Regional Commissioner, New York Region.

The areas of contention herein are those within the purview of subsections (iv) and (v), primarily the latter. On this point, the testimony of the Customs decisionmaker, Mr. Roth, is:

We found no evidence that would be inconsistent, in our opinion, with a finding of good faith, however. *With respect to detriment we made no finding that a particular agreement was binding or with respect to the relief, if any, which would have been available under force majeure or similar provisions contained in a particular agreement.*[88]

In view of this admission that there was no finding as to detriment, a key question is whether the administrative record[89] supports RAJ and Citicorp claims of such reliance.[90]

### A. The Record on RAJ

To begin with, the administrative record certified by decisionmaker Roth does not contain the request for a ruling apparently made by RAJ on May 6, 1985. Be that as it may, RAJ, seemingly on the advice of counsel,[91] assumed that a ruling letter would be issued automatically.[92] It did not wait for such a letter, but rather entered as

88. Attachment to page 126 of transcript of deposition of John T. Roth on October 15, 1985 [hereinafter cited as "Roth Deposition"] (emphasis added).

89. As indicated in Point I above, the parties agree that the actions of the defendants are to be measured by the contents of this record. The defendants, as well as RAJ and Citicorp, objected at the start of the trial to any supplementation of that record, and this court has concluded that it is not at liberty to disregard the certification of the decisionmaker as to the contents of the record before him.

90. The importers assert essentially two types of reliance claims, one involving business activities they engaged in in connection with the June 1985 ruling letters. The second involves importation of fuel ethanol after Customs had agreed in August 1985 to grandfather such shipments.

91. *See* RD 21 (letter from R. Sarah Compton, Esq. to Harvey B. Fox (Aug. 9, 1985) [hereinafter cited as "Compton August 9 Letter"], stat-

ing at page 5 that "[i]n May 1985, RAJ Chemical contacted Washington counsel and was informed that the Asencio letter was accurate, valid and in effect") and (Affidavit of Maulik H. Radia, para. 11 (Aug. 7, 1985)).

92. Counsel and Mr. Radia contend that RAJ received oral assurances from the Customs Service's Import Specialist in New York that the item 901.50 duty would not be levied and that a ruling letter would be issued upon request. *See* Compton August 9 Letter, p. 5 and Radia Affidavit, pp. 3–4.

RAJ could not have relied on the oral assurances of the Import Specialist. While oral inquiries regarding rulings may be made, the regulations clearly state that the "Customs Service will not issue rulings in response to oral requests. Oral opinions or advice of Customs Service personnel are not binding on the Customs Service." 19 C.F.R. 177.1(b).

of May 9, 1985 into what it now claims was a binding contract to supply the Beacon Oil Company in California with approximately four million gallons of ethanol monthly for one year.

The documents submitted by RAJ to the Customs Service, however, do not confirm the existence of such a contract with Beacon. The document in the record purported to be the contract [RD 21, Ex.5] is not signed, nor does it reflect the name of the other party.[93] RAJ submitted to Customs a copy of a telex to an undisclosed party, dated May 15, 1985, that made reference to its offer to sell ethanol/toluene as of May 9th. *See* RD 21, Exhibit 4. In this telex, Mr. Radia listed the conditions for a letter of credit and stated that RAJ had yet to receive a telex from the putative buyer "accepting our agreement as out lined [*sic*] in our telex of May 9, 1985." [94]

The May 15 telex projected a "loading date around May 25, 1985". RD 21, Exhibit 4. At that time, RAJ apparently was attempting to negotiate the purchase of ethanol from Brazil. On May 9th, Mr. Radia had reduced to a writing to S.A. Costa Pinto Exportacao e Importacao ("CP") what he apparently believed was a CP offer for the sale of four million gallons of ethanol/toluene and RAJ's counter offer to purchase eight million gallons.[95] Mr. Radia had telexed CP on May 12th and agreed to "reluctantly accept" an offer for four million gallons at a price of two cents more per gallon than the price RAJ had contem-

plated paying for the same quantity in the May 9 telex. *See* RD 21, Exhibit 7.

RAJ claims that these documents show that a contract "was negotiated and executed on the 'spot market.' " [96] On May 22nd, a letter of credit was posted for RAJ's benefit. *See* RD 42. Under its terms, the bank would pay if RAJ provided documents showing delivery of ethyl alcohol into the buyer's tank at Redwood City, California.[97] While the quantity was not specified, the price per gallon and the amount of the letter of credit were. Simple arithmetic discloses that the letter was for the purchase of six million gallons.

 The letter of credit posted for the benefit of RAJ did not bind it to sell any ethanol. RAJ could draw on that letter if it provided the bank with proper documentation of receipt of the alcohol. RAJ would not be penalized on account of the letter of credit if it failed to make delivery. In its reply brief, page 48, RAJ attempts to shift the burden to the plaintiffs to explain why a letter of credit would be posted if RAJ had no obligations to perform. But, at the administrative level, the burden was on RAJ to supply sufficient evidence as to its reliance claims.

 Customs issued its ruling letter to RAJ on June 3, 1985. *See* RD 17. However, if RAJ had binding agreements, the contents of the administrative record suggest their existence prior to this date and

---

**93.** If the absence of any signature or name was the result of redaction for fear of disclosure of confidential information, that fear was unwarranted in view of safeguards such as 19 C.F.R. 103.15, which provides that

the disclosure of information relative to the business of one importer or exporter that is acquired by a Customs officer or employee in an official capacity to any person not authorized by law or regulations to receive this information is a ground for dismissal from the United States Customs Service, suspension, or other disciplinary action, and if done for a valuable consideration subjects that person to criminal prosecution.

**94.** RD 21, Exhibit 4, p. 2. The administrative record does not include a copy of a telex dated May 9th to the putative buyer.

**95.** *See* RD 21, Exhibit 6. The record does not contain a response from CP.

**96.** Compton August 9 Letter, p. 6. While the documents show that RAJ had agreed to the price fixed by CP on May 12th, there is evidence in the record that CP was still considering the terms of the proposal on May 15th, and its response was due by the end of May 16th. In his telegram to the California buyer, Mr. Radia mentioned that "the attorneys of the Brazillian [*sic*] Company is [*sic*] studying the terms and conitions [*sic*] of the sale and should respond by end of May 16, 1985." RD 21, Exhibit 4, p. 2.

**97.** The buyer's name was apparently redacted by RAJ from the copy it sent to the Customs Service.

therefore that no rational basis existed for the Service's acceptance of a RAJ claim of actual reliance on the letter.

 The court also fails to discern a rational basis for any Customs acceptance of RAJ's claim that it entered into its supply contract on June 24, 1985.[98] A June 24 agreement [99] established that CP would be the exclusive supplier and that RAJ would be the exclusive buyer of "the product" for four markets in the United States, including California. Under its terms, RAJ would lose the status of exclusive buyer if it failed to purchase for each market minimum monthly orders. It would also lose its status if it failed to place minimum first orders by specific dates set forth in the agreement.[100] But, contrary to RAJ's claim, this agreement did not obligate it to purchase anything from CP. Rather, RAJ was given an option to buy ethanol at a price that "will be negotiated under good faith on a case by case basis." [101] In any event, there simply is nothing in the record that shows that the ethanol/toluene for the September 4 shipment at issue herein was purchased by RAJ pursuant to the June 24 agreement.

 The plaintiffs have attempted to show that the order for this shipment was placed on August 1, 1985 and accepted on August 2nd.[102] But plaintiffs' cross-examination of Mr. Radia proves that this shipment was not sent in response to such an order. In effect, Mr. Radia testified that he paid almost six cents less for the fuel ethanol than the price stated in his August 1 offer.[103] The administrative record does not contain any explanation for such a sudden price reduction.

RAJ has attempted to venture outside this record, but the attempt only weakens its argument. At trial, RAJ offered an exhibit (4) that shows that the letter of credit was transferred for the benefit of CP. The document, dated May 25, 1985, states the price per gallon to be the same as the amount indicated in the Radia testimony. The total value of the transfer equaled six million times the listed gallon price.

The conclusion to be drawn from the record (and the offered exhibit) is that the September 4 shipment was made pursuant to a May agreement.[104] The price in the letter of credit and the quantity correspond to the price which RAJ paid and to the quantity which it received,[105] and the delivery was made to the port indicated in the letter of credit.[106] In sum, examination of

**98.** *See* RD 22, p. 2 (letter dated August 16, 1985 from R. Sarah Compton, Esq. to Harvey B. Fox).

**99.** RAJ provided Customs with two copies. In one, the product is defined as "anhydrous alcohol blended with more than 5% denaturing agents from Brazil." In the other, the product is defined as "anhydrous alcohol mixed with toluene, xylene or benzene from Brazil." *See* RD 21, Exhibit 12.

**100.** The first order for California had to be placed by August 15, 1985. The first order for each of the other three markets had to be placed by July 10, 1985. The record does not reflect that RAJ placed timely orders for those other markets.

**101.** RD 21, Exhibit 12. Of course, Section 2–305(1) of the Uniform Commercial Code provides that "parties if they so intend can conclude a contract for sale even though the price is not settled."

**102.** *See* Plaintiffs' Post-Trial Brief, pp. 83–84. Plaintiffs' purpose is to show that RAJ entered into a contract at a time when it was known in the industry that Customs was revoking its ruling letters.

**103.** *Compare* Tr. at 132 *and* Radia Deposition, p. 15 *with* RD 21, Exhibit 12, p. 5.

**104.** Although the record is unclear as to why a clause—6—in the June 24 agreement attempting to void any previous contract did not have that effect on the May order, the record is clear that RAJ and CP did not treat that order as void.

**105.** The price which RAJ agreed to pay for four million gallons on May 13, 1985 was one quarter of a cent less per gallon than what was paid.

**106.** The May 25 transfer of the letter of credit listed the shipment terms C.I.F. San Francisco. This term was clarified in a telex of May 31 requiring delivery "C.I.F. into the buyers tank at Pilot Terminal, Redwood City, California." RAJ trial Exhibit 4 at 3. This same telex requires the shipment C.I.F. San Francisco. *Id.,* p. 5. Such usage of these two cities within one document is

RAJ's record before Customs constrains this court to conclude that it was arbitrary, capricious and an abuse of discretion for the Service to have acquiesced in RAJ's claims of reliance.

### B. *Citicorp's Record*

Citicorp made three importations of fuel ethanol from Brazil [107] without payment of the duty prescribed by item 901.50, TSUS. The first, aggregating 2.2 million gallons of 92.5 percent ethanol and 7.5 percent toluene, was landed in July 1985. Citicorp admits that this shipment was made pursuant to a May 1985 agreement with the Brazilian supplier and without any prior Customs approval. *See supra* p. 943.

The company's first request for a ruling letter was apparently made in June. On June 19, 1985, Customs issued the requested ruling. *See* RD 8. The administrative record indicates that in July Citicorp engaged in negotiations by telex with a Brazilian supplier for the immediate purchase of eight million gallons of ethyl alcohol/unleaded gasoline. On July 18th, Citicorp made an offer to the supplier. *See* RD 51

at 4. On July 19th, the supplier responded with a counter offer for the same quantity at ten cents more per gallon. *See id.* at 5. Citicorp had until July 22nd to accept; it responded on that date, agreeing on price, provided that loading occurred that week and that freight did not exceed a specified price per gallon. *See id.* at 6. The supplier rejected these conditions on July 23rd, apparently because Citicorp had failed to understand that, under the offer, it would be responsible to supply the transportation.[108] Citicorp was afforded an opportunity to request a price for a C.I.F. or C & F transaction.[109] Citicorp responded on the same day, requesting an offer on a C & F basis.[110] The record does not reflect the supplier's making of an offer in accordance with this request. However, the supplier made an offer, dated July 25th,[111] for the sale F.O.B. Santos at the price agreed to in the earlier telexes. *See* RD 51 at 21. The offer specified that it was "valid for acceptance until July 26, 1985, close business New York time." *Id.* at 20. Citicorp responded that day by nominating a vessel and demanding that the ethyl alcohol/unleaded gasoline meet quality standards

---

understandable in light of their proximity and Customs Service inclusion of Redwood City within the port of San Francisco. *See, e.g.*, T.D. 44731, 59 Treas. Dec. 680 (1931). *See also* T.D. 56020, 98 Treas.Dec. 582 (1963); T.D. 79–74, 13 Cust.Bull. 169; T.D. 82–9, 16 Cust.Bull. 22; and 19 C.F.R. 101.3(b).

**107.** Citicorp apparently has only recently entered into this business. A person with over 40 years of experience in the industry testified that Citicorp "is not generally known as being active in the production or sale of ethanol". Schwandt Deposition, p. 55.

**108.** *See* RD 51 at 7. The various telexes all state F.O.B. Brazil or Santos as a shipment term. U.C.C. Section 2–319 reads:

(1) Unless otherwise agreed the term F.O.B. (which means "free on board") at a named place, even though used only in connection with the stated price, is a delivery term under which

(a) when the term is F.O.B. the place of shipment, the seller must at that place ship the goods in the manner provided in this Article (Section 2–504) and bear the expense and risk of putting them into the possession of the carrier; or

(b) when the term is F.O.B. the place of destination, the seller must at his own expense and risk transport the goods to that place and there tender delivery of them in the manner provided in this Article (Section 2–503); ...

The term used in the documents here falls under subsection (a). That is, F.O.B.-the-place-of-shipment requires the buyer to pay the cost of transportation from the point of embarkment.

Citicorp expressed concern about the potential freight charges in its telex of July 22. The July 23 telex shows that the Brazilian supplier became concerned that Citicorp did not understand what an F.O.B.-the-place-of-shipment term means.

**109.** *See* RD 51 at 7. U.C.C. Section 2–320(1) states that the "term C.I.F. means that the price includes in a lump sum the cost of the goods and the insurance and freight to the named destination. The term C. & F. or C.F. means that the price so includes cost and freight to the named destination."

**110.** *See* RD 51 at 8. This request is further indication of misunderstanding.

**111.** The offer appears to have been signed on July 16, 1985. *See* RD 51 at 20.

specified in the telex. It requested that the supplier telex confirmation of acceptance of the conditions and stated that "[u]pon receipt of this information we will confirm acceptance of your offer." *Id.* at 19. The supplier responded that same day, agreeing to Citicorp's selection of the vessel but disagreeing as to the quality specifications. The supplier offered final product specifications "as it is" in the tanks in Santos, Brazil. *See id.* at 18. The supplier stated in that telex that Citicorp should confirm on July 29th.[112]

■■■■ No such confirmation is contained in the record, nor can it be persuasively argued that the parties had agreed on the basic terms and were just missing a formality. There was no agreement on the fundamental issue of product quality, and this court therefore cannot conclude that it was not arbitrary, capricious and an abuse of discretion for Customs to accept the claim of reliance made by Citicorp. A July 29 telex from the company, confirming an agreement, was not submitted to Customs and therefore could not have been considered when the Service made its decision. However, even if that document, produced at trial as Citicorp Exhibit 11, were part of the record before the decisionmaker, it would not have demonstrated sufficient detriment—for the confirmation, as well as the offer dated July 25, contain broadly-worded *force majeure* clauses which gave Citicorp an option of not accepting the fuel ethanol after Customs revoked its ruling letter.

Citicorp urges the court to consider its entering into a downstream contract because of reliance on its ruling letter. *See* Trial Brief of Citicorp, p. 8. The administrative record, however, only contains a July 26 offer to purchase eight million gallons by one of Citicorp's customers.[113] The offeror specifically requested confirmation of the proposed purchase agreement. *See* RD 51 at 10. No such confirmation is in the record, and therefore the Customs Service could not have made its finding of reliance on the basis of a binding downstream contract.

■■■■ Citicorp offered at trial a copy of this agreement,[114] but the court notes that it too has a broadly-worded *force majeure* clause. Citicorp's assertion that this clause will not be invoked even if it is required to pay the contested duty [115] has no bearing on its claim of reliance.[116] The critical question here is not whether Citicorp will pay that duty but whether the Customs Service's revocation of its ruling letter obligated Citicorp, as a matter of law, to bear the burden of any payment.

■■■■ Citicorp also attempts to show that it chartered a ship to transport the fuel ethanol on the basis of its ruling letter. *See* Reply Brief of Citicorp, p. 50 and Trial Exhibit 9. A confidential memorandum to the Commissioner of Customs from the Director of the Classification and Value Division with a handwritten date of 8/8/85 states that Citicorp would have lost more than $450,000 if that vessel had left Brazil without the alcohol. *See* RD 70, pp. 1–2. Reliance was deemed to exist because Citicorp had submitted "documentary evidence demonstrating that the vessel in question had been chartered prior to August 2nd".[117]

112. *See* RD 51 at 18. This extended the period for acceptance beyond July 26th.

113. *See* RD 51 at 9. The price was to be mutually agreed upon and consistent with a prior contract also contained in the record.

114. Citicorp Exhibit 10.

115. *See* Trial Brief of Citicorp, p. 18, n. 54.

116. Customs has an obligation to collect duties. The business decisions of importers as to how to allocate payment of those duties are generally beyond the ken of the Service.

117. RD 70, p. 2. This confidential memorandum indicates that one Boyden Gray either influenced, or attempted to influence, the Service's acquiescence in Citicorp's claim of reliance.

The 1985–1986 Congressional Directory lists (at page 445) C. Boyden Gray as Counsel and Deputy Chief of Staff in the Office of the Vice President of the United States. Apparently, Mr. Gray had had a meeting on July 26, 1985 with "Brazilian Guests" and "Citibank Officers", among others, to discuss the "Brazilian Ethanol Export Program to [the] US". *See* RD 50 at 5.

Contrary to this assertion, there is nothing in the administrative record which documents Citicorp chartering of the ship.

In order to make a determination as to reliance, Customs would have had to examine the charter-party and determine whether Citicorp was bound by its terms.[118] Moreover, if its indicated date is reliable, the confidential memorandum [RD 70] is nothing more than a post-hoc rationalization for the Service's decision on August 7, 1985 [RD 6] to permit Citicorp to import some eight million gallons of fuel ethanol from Brazil without payment of the item 901.50 duty. Since the decisionmaker had no documentary proof of the terms of the charter-party[119], the court concludes that his acquiescence in the claim of reliance was arbitrary, capricious and an abuse of discretion.

■ The third Citicorp shipment, consisting of approximately 11 million gallons of ethanol/gasoline from Brazil, was entered in late October 1985. Customs determined to grandfather this shipment on the basis of Citicorp's purported reliance.

Citicorp claimed that it had entered into a contract with several Brazilian suppliers at a meeting on July 26, 1985. *See* RD 50, Exhibit 1. The administrative record, however, only shows that a letter of intent, subject to confirmation, was entered into on that day. On August 1st and 2nd, Citicorp telexed the proposed suppliers to confirm the sales agreement. *See* RD 49, Exhibits 5–7. One of those suppliers responded on August 2nd in a telex:

I want to advise you that it is not possible to reconfirm the sales agree-

ment at this moment because we are not sure about the consequences in terms of the general agreement that we are doing with the American government. Otherwise, we need our minister's confirmation. I'm trying to get a solution today but I think that it will not be possible. I will be contacting you again this coming Monday. RD 49, Exhibit 8.

Citicorp did not submit to Customs anything substantiating that the agreement was ever confirmed. *See* Roth Deposition, p. 184. In its trial brief, page 10, Citicorp admits that the suppliers were unable to confirm as of August 2nd, the day Customs revoked its ruling letter. On their part, the defendants take the position that the downstream contract was not reduced to a signed writing until August 6th. *See* Defendants' Memorandum of Law, p. 25.

In entering into a contract after it knew of the revocation of its ruling letter, Citicorp assumed the risk of having the item 901.50 duty imposed. Moreover, Citicorp, which was well aware in July that Customs was considering revoking its ruling,[120] carefully protected itself by drafting *force majeure* clauses into its proposed agreements to purchase[121] and to sell the ethanol. A Vice President of Citicorp International testified that, at a meeting with the various suppliers and the proposed downstream purchaser on July 26th, "there were substantial discussions relating to force majeure and it was explicitly stated to exclude changes in Customs law, government regulations and similar type of actions." Berry Deposition, p. 25.

---

**118.** At trial, Citicorp offered a copy of a charter-party [Exhibit 9], but the cost of demurrage in that document is much less than the $450,000 mentioned by the Director of Classification and Value. Furthermore, Citicorp trial Exhibit 12 (letter from Citicorp counsel to Harvey B. Fox dated August 7, 1985) was not part of the certified record before the decisionmaker.

**119.** Reference to the chartering of a vessel in the record is contained in a letter from Citicorp's attorney dated August 5, 1985 that accompanied documents submitted to Customs. *See* RD 51, p. 2.

**120.** *See, e.g.,* Trial Brief of Citicorp, p. 11.

**121.** The original memorandum that was prepared for the purchase of the fuels from the Brazilians apparently did not contain a *force majeure* clause, but there was an understanding among all of the parties that a change in the Customs ruling would provide a vehicle for the renegotiation of the agreement. *Compare* RD 50, p. 9 *with* transcript of deposition of Charles L. Berry on December 12, 1985 [hereinafter cited as "Berry Deposition"], p. 26.

In light of the lack of binding contracts as of August 2, 1985 and of Citicorp's ability to avoid these agreements on the ground of revocation of its ruling letter, there does not appear to be a rational basis for the Customs Service's decision to grandfather shipments made pursuant thereto. Therefore, this court concludes that that decision was arbitrary, capricious and an abuse of discretion.

## C. *Customs Post-Revocation Notifications Not Ruling Letters*

Subsequent to revocation on August 2 (and 7), 1985 of its earlier ruling letters, Customs began notifying Citicorp, RAJ and other importers, commencing with a letter to Citicorp on August 7th [RD 6], that they could import the specified quantities of fuel ethanol without payment of the item 901.50 duty until November 1, 1985 based on their presentations as to reliance.[122] The defendants posit the issue as follows at page 3 of their memorandum:

> Assuming, *arguendo*, that the Customs Service had authority to permit entry of ethanol blends without payment of the duty provided by item 901.50, TSUS, whether the August 7, 23, and 27, 1985 decisions to do so were in derogation of law.

For their part, Citicorp and RAJ now argue that these notifications from Customs constitute "ruling letters." [123] Under its regulation, 19 C.F.R. § 177.9(a), ruling letters bind the Service. Such a letter's function is to state what Customs believes is "the proper classification of an article under the provisions of the Tariff Schedules of the United States." 19 C.F.R. § 177.9(b)(2).

The letters at issue in this case did not do this. Rather, they simply notified the importers of Customs' intent to disregard what it then knew to be the mandated classification and rate of duty for fuel etha-

nol. Clearly, those notifications were not ruling letters.

Section 177.1(d) of Title 19, C.F.R. defines a ruling letter as "a ruling issued in response to a written request therefor and set forth in a letter addressed to the person making the request or his designee." A ruling letter issued prior to the filing of entry documents is a letter that is capable of being "attached to the documents filed in connection with that transaction with the appropriate Customs Service field office or otherwise br[ought] ... to the attention of the appropriate Customs officer." 19 C.F.R. § 177.8(a)(2).

An examination of the grandfather decisions herein shows that at least some of them required additional documentation by the importers before Customs would issue a letter that could be attached to the import documents. For example, the August 27 notice sent to Citicorp stated that, prior to any entry, the importer would have to provide Customs with

> written notification identifying the name of the vessel, the quantity of mixture to be unladed, the port of entry, the importer number, and the agreement under which such shipment was made. This information should be sent to the Director, Classification and Value Division, U.S. Customs, Room 2216, 1301 Constitution Ave., N.W., Washington, D.C. 20229. We will examine this information and, if the shipment is found to be made pursuant to and in accordance with the agreement(s) you have previously provided us, *we will provide you with a letter to be presented to Customs port officials at the time the shipment is entered.* A separate letter must be obtained for each shipment. RD 5, pp. 1–2 (emphasis added).

On its face, this notice was incapable of being presented with the entry documents. It merely advised that, if further informa-

---

**122.** *See* RD 2 (Certified Oil Company—Aug. 12, 1985); RD 15 (RAJ—Aug. 23, 1985); RD 1 (Certified), RD 5 (Citicorp), RD 14 (RAJ), RD's 24, 25 (Valley Green International Trading Corp.) and RD 39 (Southern Missouri) (Aug. 27, 1985);

RD 121 (Southern Missouri—Oct. 11, 1985); and RD 131 (Citicorp—Oct. 18, 1985).

**123.** *See, e.g.,* Trial Brief of Citicorp, pp. 13 and 48 and RAJ Reply Brief, p. 56.

tion were supplied, Citicorp would receive a letter that could be presented to Service officers.

■ Citicorp sent a letter with details on September 4, 1985,[124] and Customs responded on September 6th with letters to be presented upon entry. *See* RD 63. The September 4 letter to Customs and the September 6 letters to Citicorp cannot be construed as a request for, and the issuance of, ruling letters since this case had already been commenced on August 29th. According to 19 C.F.R. § 177.7(b), no ruling letter will be issued with respect to any matter which is pending before this Court of International Trade.

Finally, contrary to Citicorp's contention,[125] the defendants have not characterized their decisions to grandfather as ruling letters. In fact, their counsel in this case has carefully refrained from deeming those decisions ruling letters.

■ The intervenor-defendants argue that it would be inequitable to make them now remit the correct duty in view of their reliance on the advice of Customs. This argument has little merit with regard to the August 27 decisions, as the degree of reliance by the importers is minimal, if not non-existent. Indeed, Brazil imposed an embargo on shipments of ethanol on the day of those decisions which remained in effect at least until September 13, 1985. *See* Sept. 13 Tr. at 37. Also, by that point, the importers were clearly on notice that there was a serious challenge to the validity of those decisions.

■ Similarly, RAJ could not have relied much on the notification it received

dated August 23, 1985 since it had shipped the ethanol around August 8th. In other words, its shipment was already on the high seas. Arguably, RAJ would not have entered that shipment without a decision from Customs, but the vessel arrived on September 4th, or after this case had been commenced. At that point, RAJ could have decided not to enter the ethanol—an option it may well have originally contemplated.

One of Citicorp's shipments left Brazil after Customs had determined on August 7th to grandfather it. Citicorp, however, assumed the risk of paying the correct duty when it entered the fuel ethanol after this case had been brought. The importer still had the option not to enter the shipment.

Just prior to the filing of the case, a so-called Ad Hoc Committee of the Ethanol Importers had urged Customs in a legal memorandum dated August 27, 1985 to comply with the requirements of 19 U.S.C. § 1315(d) and 19 C.F.R. § 177.10(c) for the following reason, among others:

> ADM is likely to challenge any delayed effective date. Therefore, a procedurally defective delay gives no assurance to the importers. If it is intended that the importers be treated fairly in light of their reasonable reliance on valid letter rulings, any delayed effective date must of necessity be procedurally defensible or the importers risk judicial reversal of the delayed effective date. The risk of such a reversal is unacceptably large if no legal basis exists to support the delayed effective date. Thus, giving a delayed effective date without sound legal underpinning is to give nothing.[126]

---

**124.** *See* RD 62.

**125.** Citicorp asserts at page 49, n. 132 of its trial brief that the "Customs Service regards the August 7 and 27 letters as ruling letters". It cites the deposition testimony of Harvey B. Fox, page 10, line 4, to page 11, line 7, but that transcript does not support the assertion.

**126.** Plaintiffs' trial Exhibit 2. As indicated above, this court denied supplementation of the administrative record as against the defendants. This exhibit is referred to only in connection

with any attempted portrayal of the intervenor-defendants as unwitting importers.

Indeed, page 2 of the list of documents attached to the Roth Affidavit indicates that this document was forwarded to the defendants under cover of a letter from Citgo's counsel dated August 27, 1985. The same list also indicates that a 5-page document in the name of the Ad Hoc Committee was forwarded to the defendants at the same time by counsel for RAJ. In its reply brief, pages 61–62, RAJ now argues that the Ad Hoc Committee

In summary, whether the reliance issue is reviewed as a whole or in individual detail, the record is short of substantiation of the kind of good faith contemplated by the Customs regulation governing the effect of revocation of ruling letters. On the contrary, the record reflects the type of arbitrary and capricious behavior [127] that the Administrative Procedure Act was enacted to remedy. Stated another way, the Service's judgment is not anchored in the language and spirit of its own regulation. *Cf. Freeport Minerals Co. v. United States*, 776 F.2d 1029, 1032 (Fed.Cir.1985).

## V

Both RAJ and Citicorp argue that, if the plaintiffs are entitled to any relief, it should be prospective only.[128] Inherent in their argument, of course, is the concept that liquidation of the contested September and October fuel ethanol entries retroacts to the period before revocation; that is, the entries are the equivalent of those RAJ and Citicorp entries which occurred before August, the liquidation of which at the incorrect 5% *ad valorem* rate of duty is not challenged in this case.

The question of retroactivity can be complex,[129] but no such problem is presented here. In view of the facts and circumstances discussed in preceding Part IV, as well as the traditional standard that the rate and amount of duty assessable in liquidation are to be determined by the law in force at the time of importation [130], this court concludes that genuine retroactivity is not at issue in this case.

Nevertheless, RAJ places great emphasis on *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). In that personal injury case under the Outer Continental Shelf Lands Act, the Supreme Court conceded that its decision in *Rodrigue v. Aetna Casualty & Surety Co.*, 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969), "entirely changed the complexion" [131] of *Huson* in that a one-year state period of limitation, rather than the admiralty doctrine of laches, was applicable. Since that state period had expired, the question left was application of this change in judicial doctrine to the individual tort plaintiff. In resolving this issue in favor of nonretroactive application, the Court summarized its prior holdings as follows, 404 U.S. at 106–07, 92 S.Ct. at 355:

> In our cases dealing with the nonretroactivity question, we have generally considered three separate factors. First, the decision to be applied nonretroactively must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, see, *e.g., Hanover Shoe v. United Shoe Machinery Corp., supra* [392 U.S. 481], at 496 [88 S.Ct. 2224, 2233, 20 L.Ed.2d. 1231 (1968) ], or by deciding an issue of first impression whose resolution was not clearly foreshadowed, see, *e.g., Allen v. State Board of Elections, supra* [393 U.S.], at 572 [89 S.Ct. 817, 835, 22 L.Ed.2d 1 (1969) ]. Second, it has been stressed that "we must ... weigh the merits and demerits in each case by looking to the prior history of the rule in

submission was an attempt to persuade the Service to institute notice and comment procedures before reconsidering the original ruling letter. Such a lobbying effort by importers hardly amounts to a recognition that the grandfather rulings were unlawful.

**127.** The court notes in passing that the agency record contains a letter from the defendant Commissioner to Senator Dole [RD 95] wherein the author states in the context of the "ethanol classification issue":

> My experience as Commissioner of Customs, has been, that certain importers are often ingeniously clever at developing methods or schemes to avoid paying the appropri-

ate duties on products they import.... Oftentimes ... importers find a loophole or other methods of manipulating the tariff schedules to their benefit....

**128.** *See, e.g.,* RAJ Reply Brief, pp. 58, 64; Reply Brief of Citicorp, pp. 39, 43.

**129.** *See, e.g.,* Graetz, *Legal Transitions: The Case of Retroactivity in Income Tax Revision,* 126 U.Pa.L.Rev. 47 (1977).

**130.** *See, e.g., United States v. Miles,* 57 CCPA 1, 4, C.A.D. 967, 416 F.2d 973, 975 (1969).

**131.** 404 U.S. at 99, 92 S.Ct. at 351.

question, its purpose and effect, and whether retrospective operation will further or retard its operation." *Linkletter v. Walker, supra* [381 U.S.], at 629 [85 S.Ct. 1731, 14 L.Ed.2d 601 (1965)]. Finally, we have weighed the inequity imposed by retroactive application, for "[w]here a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity." *Cipriano v. City of Houma, supra* [395 U.S.], at 706 [89 S.Ct. 1897, 1900, 23 L.Ed.2d 647].

However, even if this case were an appropriate one for analysis of the foregoing factors, such analysis would not lead to a determination not to impose the correct duty on the fuel ethanol entered in September and October. Certainly, this opinion neither overrules clear past precedent on which the litigants may have relied nor does it decide an issue of first impression of the kind resolved in *Allen v. State Board of Elections*, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969), where the purview of a section of the newly-enacted Voting Rights Act of 1965 was at issue.

As to the second *Huson* factor, RAJ argues that this court "should determine whether retroactive application of th[is] decision will promote the purpose of the rule in question." RAJ Post-Trial Brief, p. 100. The classic case cited by the Supreme Court, *Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), decided that the exclusionary rule, made applicable to state criminal proceedings by *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), should not govern other cases finally resolved prior to *Mapp*. Of course, the purpose of that rule is as "the only effective deterrent to lawless police action." 381 U.S. at 636. No judicial rule of such moment is at issue in the case at bar, which simply seeks imposition of the duty on imports of fuel ethanol *after* the

Customs Service's reconfirmation of the correct, applicable rate.

Thirdly, both RAJ and Citicorp contend that the equities favor nonimposition of the item 901.50 duty. The Court concluded in its opinion in *Cipriano v. City of Houma*, 395 U.S. 701, 706, 89 S.Ct. 1897, 1900, 23 L.Ed.2d 647 (1969), that "[s]ignificant hardships would be imposed on cities, bondholders, and others connected with municipal utilities" if its decision invalidating property-taxpayer votes to approve the issuance of revenue bonds were given full retroactive effect. No such broad-scale hardship is conceivable here, but payment of the applicable duty will no doubt be painful. Recently, however, the Supreme Court was constrained to remind the government's adversary that:

> Justice Holmes wrote: "Men must turn square corners when they deal with the Government." *Rock Island, A. & L.R. Co. v. United States*, 254 U.S. 141, 143 [41 S.Ct. 55, 56, 65 L.Ed. 188] (1920). This observation has its greatest force when a private party seeks to spend the Government's money. Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law; respondent could expect no less than to be held to the most demanding standards in its quest for public funds. This is consistent with the general rule that those who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law.[132]

The Court's footnote to this reminder quotes from *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947), to wit:

> ... Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the

---

**132.** *Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 63, 104 S.Ct.

2218, 2225, 81 L.Ed.2d 42 (1984).

bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rulemaking power. And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority.

That footnote also cites *United States v. California,* 332 U.S. 19, 39–40, 67 S.Ct. 1658, 1668–69, 91 L.Ed. 1889 (1947); *United States v. Stewart,* 311 U.S. 60, 70, 61 S.Ct. 102, 108, 85 L.Ed. 40 (1940); *United States v. San Francisco,* 310 U.S. 16, 31–32, 60 S.Ct. 749, 757, 84 L.Ed. 1050 (1940); *Wilber National Bank v. United States,* 294 U.S. 120, 123–124, 55 S.Ct. 362, 363–364, 79 L.Ed. 798 (1935); *Utah v. United States,* 284 U.S. 534, 545–546, 52 S.Ct. 232, 235, 76 L.Ed. 469 (1932); *Jeems Bayou Fishing & Hunting Club v. United States,* 260 U.S. 561, 564, 43 S.Ct. 205, 206, 67 L.Ed. 402 (1923); *Sutton v. United States,* 256 U.S. 575, 579, 41 S.Ct. 563, 564, 65 L.Ed. 1099 (1921); *Utah Power & Light Co. v. United States,* 243 U.S. 389, 409, 37 S.Ct. 387, 391, 61 L.Ed. 791 (1917); *Pine River Logging & Improvement Co. v. United States,* 186 U.S. 279, 291, 22 S.Ct. 920, 925, 46 L.Ed. 1164 (1902); *Hart v. United States,* 5 Otto 316, 318–319, 95 U.S. 316, 318–319, 24 L.Ed. 479 (1877); *Gibbons v. United States,* 75 U.S. (8 Wall.) 269, 274, 19 L.Ed. 453 (1869); *Lee v. Munroe,* 11 U.S. (7 Cranch) 366, 368–69, 3 L.Ed. 373 (1813).

The cases are indeed legion on this point. For example, in *Atlantic Richfield Company v. Hickel,* 432 F.2d 587 (10th Cir.1970), the holder of leases pursuant to the Mineral Leasing Act of 1920 had paid royalties for more than 13 years before the Department of the Interior (and ultimately its Secretary) demanded additional royalties based on an interpretation of the statute at odds with the ruling of the Acting Director of the Geological Survey originally given and relied on during the intervening years. The court of appeals referred to

the established principle that the United States may not be estopped from asserting a lawful claim by the erroneous or unauthorized actions or statements of its agents or employees, nor may the rights of the United States be waived by unauthorized agents' acts. As harsh as the tenet is under practical application, an administrative determination running contrary to law will not constitute an estoppel against the federal government. 432 F.2d at 592 (footnote omitted).

*Dixon v. United States,* 381 U.S. 68, 72–73, 85 S.Ct. 1301, 1304, 14 L.Ed.2d 223 (1965), states:

In *Automobile Club of Michigan v. Commissioner,* ... we held that the Commissioner [of Internal Revenue] is empowered retroactively to correct mistakes of law in the application of the tax laws to particular transactions. He may do so even where a taxpayer may have relied to his detriment on the Commissioner's mistake. See *Manhattan General Equipment Co. v. Commissioner,* 297 U.S. 129 [56 S.Ct. 397, 80 L.Ed. 528 (1936) ]. This principle is no more than a reflection of the fact that Congress, not the Commissioner, prescribes the tax laws. The Commissioner's rulings have only such force as Congress chooses to give them, and Congress has not given them the force of law. Consequently it would appear that the Commissioner's acquiescence in an erroneous decision, published as a ruling, cannot in and of itself bar the United States from collecting a tax otherwise lawfully due. [footnote omitted]

The Court's opinion then quoted at 381 U.S. at 74, 85 S.Ct. at 1305 from its *Manhattan General Equipment Co.* decision as follows:

The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law ... but the power to adopt regulations to carry into effect the will of Congress as expressed by the statute. A regulation which does not do this, but operates to create a rule out of harmony with the

statute, is a mere nullity. 297 U.S. at 134, 56 S.Ct. at 400.

While the tax law has changed over the years since these decisions, the foregoing principles enunciated by the Supreme Court have not. *See, e.g., Consolidated Edison Company of New York, Inc. v. United States,* 782 F.2d 322, 325 (2dCir.1986):

> ... [E]ven if the 1976 ruling could be construed as some discernible modification of the tax law, such modification would still properly apply to Con Ed's 1972–76 taxes, given the Commissioner's broad authority to apply correct rulings retroactively.

Here, of course, a defendant is the Commissioner of Customs (and not of Internal Revenue), and he is making no apparent attempt to collect the duties prescribed by Congress. That is, there seems to be an abdication of the mission of the Customs Service to collect and protect the revenues and to enforce the laws.[133] *See generally* Department of the Treasury, U.S. Customs Service, *Fundamentals of Customs Tariff & Trade Operations,* pp. ii–iii (May 1983). It is this void which the plaintiffs are attempting to remedy.

It is argued at length, however, by Citicorp that the plaintiffs lack standing to obtain relief from the failure to collect the proper duty. *E.g.,* "No case of which we are aware supports plaintiffs' position." Reply Brief of Citicorp, p. 38. But this argument overlooks *Zenith Radio Corp. v. United States,* 710 F.2d 806 (Fed.Cir.1983), wherein the court sustained the domestic interested party's standing to obtain suspension of liquidation of earlier entries on the following ground, among others:

> ... Even though the '79–'80 imported articles have already been sold and the increased duties (if Zenith ultimately prevails) will go to the government, not Zenith, Zenith still has a strong, continuing, commercial-competitive stake in assuring that its competing importers will not escape the monetary sanctions deliberately imposed by Congress. Defeat of that strong congressionally recognized competitive interest and the abrogation of effective judicial review are sufficient irreparable injury here.[134]

Or, as the Supreme Court stated 150 years ago in another Customs case, *Tracy v. Swartwout,* 10 Pet. 80, 95, 35 U.S. 80, 95, 9 L.Ed. 354 (1836):

> ... It would be a most dangerous principle to establish, that the acts of a ministerial officer, when done in good faith, however injurious to private rights, and unsupported by law, should afford no ground for legal redress.

Much more recently, the Court in *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), sustained the standing of taxpayers to sue to enjoin the disbursement of federal funds appropriated under Title I of the Elementary and Secondary Education Act of 1965 for the benefit of nonpublic schools, and *Aguilar v. Felton,* —— U.S. ——, 105 S.Ct. 3232, 87 L.Ed.2d 290 (1985), affirmed the taxpayers' right to a permanent injunction against use of

---

**133.** The court in *Coalition to Preserve the Integrity of American Trademarks v. United States,* 790 F.2d 903, 918 (D.C.Cir.1986), pointed out that "the Customs Service has historically enforced what it regards to be the law so relentlessly that it required an amendment to the statute to permit tourists to bring items intended for personal use back into the country with them."

**134.** 710 F.2d at 810. In *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 39, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976), the Court stated that the "necessity that the plaintiff who seeks to invoke judicial power stand to profit in some personal interest remains an Art. III requirement." In discussing the "prudential" component of standing in *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 80–81, 98 S.Ct. 2620, 2634, 57 L.Ed.2d 595 (1978), the Court stated:

> ... Where a party champions his own rights, and where the injury alleged is a concrete and particularized one which will be prevented or redressed by the relief requested, the basic practical and prudential concerns underlying standing are generally satisfied when the constitutional requisites are met. See, *e.g., Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

In the case at bar, plaintiffs ADM and A.E. Staley meet these standards.

those funds in sectarian schools. *Cf. Felton v. Secretary, United States Department of Education,* 787 F.2d 35 (2d Cir. 1986). As for collection of taxes, the court in *Abortion Rights Mobilization, Inc. v. Regan,* 544 F.Supp. 471 (S.D.N.Y.1982) and 603 F.Supp. 970 (S.D.N.Y.1985), has twice upheld the standing of certain plaintiffs to seek a permanent injunction against continued exemption from taxation under 26 U.S.C. § 501(c) of two organizations.

 The defendants and intervenor-defendants have argued from the outset that the only avenue to legal redress of issues of the kind raised by the plaintiffs is via a petition under the Tariff Act of 1930, 19 U.S.C. § 1516. To the extent this argument is still pressed now, however, it disregards this court's conclusion in Slip Op. 85–119 and repeated here that this case entails causes of action independent of the Tariff Act, to wit:

> There is no doubt that a petition pursuant to Section 1516 is the primary and traditional means of challenging the classification or rate of duty upon designated imported merchandise, but the foregoing absolutist argument seemingly disregards the precise nature of this action. Here, the defendants have accepted

plaintiffs' position that item 901.50, TSUS applies, *i.e., there is no dispute as to classification or rate of duty within the meaning of Section 1516.* Rather, the controversy stems from defendants' determination to deviate from the duty. The plaintiffs seek to counteract this transitory digression, in part through declaratory judgment and mandamus, both federal-court remedies of long standing and independent of remedies prescribed by the Tariff Act of 1930.[135]

 To quote again from the report of the Committee on the Judiciary of the House of Representatives on the Customs Courts Act of 1980:

> Subsection (c)(1) [of 28 U.S.C. § 2643] is a general grant of authority for the Court of International Trade to order any form of relief that it deems appropriate under the circumstances. It is the Committee's intent that this authorization be deemed to grant the Court of International Trade remedial powers co-extensive with those of a federal district court. This provision makes it clear that the court may issue declaratory judgments, writs of prohibition and mandamus, orders of remand and preliminary or permanent injunctive relief....[136]

**135.** 623 F.Supp. at 1268 (emphasis added). If there were a dispute with Customs as to classification and rate of duty, Section 1516 confers automatic standing on domestic interested parties such as ADM and A.E. Staley to file an administrative protest. The absence of such a dispute herein has forced these complainants to satisfy a higher standard for relief, namely, proof of actual injury within the meaning of Article III of the Constitution.

For many years, domestic interested parties have been permitted to compel enforcement of tariffs. *See, e.g., Bradford Co. v. American Lithographic Co.,* 12 Ct.Cust.App. 318, T.D. 40318 (1924); *United States v. Nylonge Corp.,* 48 CCPA 55, C.A.D. 764 (1960). In fact, the tradition of third-party involvement began prior to the enactment of Section 1516. *See, e.g., Wakem v. United States,* T.D. 25827 (C.C.N.D.Ill.1904); *United States v. Schwartz & Co.,* 3 Ct.Cust.App. 24, 49, T.D. 32315 (1912); *But compare Fletcher v. United States,* 25 CCPA 195, T.D. 49294, 92 F.2d 713 (1937), *with Luggage and Leather Goods Manufacturers of America v. United States,* 7 CIT 258, 588 F.Supp. 1413 (1984).

**136.** H.R.Rep. No. 1235, 96th Cong., 2d Sess. 61 (1980), U.S.Code Cong. & Admin.News 1980, pp. 3729, 3772. Moreover, subsection (a) of 28 U.S.C. 2643 provides:

> The Court of International Trade may enter a money judgment—
> (1) for or against the United States in any civil action commenced under section 1581 or 1582 of this title; and
> (2) for or against the United States or any other party in any counterclaim, cross-claim, or third-party action under section 1583 of this title.

The Committee report indicates that the intent of subsection (a) is to bypass reliquidation in appropriate cases. *See id.* at 60, U.S.Code Cong. & Admin.News 1980, p. 3772.

The facts and circumstances herein clearly show that this is an appropriate case to bypass reliquidation. To the extent the defendants are bound by 19 U.S.C. 1514, 28 U.S.C. 2643(b) empowers the court to hold a hearing on the correct amount of duties owed—if the parties herein prove unable to compute them independently.

█ RAJ and Citicorp (as well as Certified), over the government's opposition, intervened as parties in this case, raising in their papers a panoply of issues, including the applicability of item 901.50, TSUS and their obligations, if any, to the United States as a result of their importation of the Brazilian fuel ethanol.[137] RAJ and Citicorp, having voluntarily submitted themselves to the jurisdiction of the court, actively joined issue with the plaintiffs and availed themselves of their rights to be heard and to present evidence in support of their positions.

After carefully considering those positions, this court concludes that they do not insulate the fuel ethanol entries at issue from payment of the full duty prescribed by Congress for importation of that substance. To the extent Customs has not yet liquidated those entries, the Service will be enjoined from doing so at a rate other than that mandated under item 901.50, TSUS. RAJ and Citicorp are obligated to remit the additional duties on their entries already liquidated.

Judgment will enter in accordance with this opinion, which represents the court's findings of fact and conclusions of law.

### JUDGMENT

This case having been duly submitted for decision, and the court, after due deliberation, having rendered a decision herein; Now, therefore, in conformity with said decision, it is

ORDERED, ADJUDGED and DECREED that the defendants did not have authority to permit the importation of fuel ethanol from Brazil into the United States beyond August 2, 1985 without the payment of duties at the rate provided for under items 427.88 and 901.50, TSUS and that defendants' decisions to permit entries of fuel ethanol from Brazil into the United States after August 2, 1985 without the payment of such duties were in excess of their statutory authority; and it is further

ORDERED, ADJUDGED and DECREED that the determinations of the defendants to permit entries of fuel ethanol from Brazil into the United States after August 2, 1985 on the ground of importer claims of reliance were arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law; and it is further

ORDERED that the defendants and their successors in office, officers, employees, agents, servants, sureties and assigns be, and they hereby are, permanently enjoined from liquidating the duties on the entries of fuel ethanol from Brazil at issue in this case at a rate other than that provided for under items 427.88 and 901.50, TSUS; and it is further hereby

ORDERED that intervenor-defendant RAJ Chemicals, Inc. remit to the United States of America within thirty (30) days of the date hereof duties equal to the rate provided for under items 427.88 and 901.50, TSUS on any of its entries of fuel ethanol from Brazil at issue in this case which have already been liquidated at a different rate of duty; and it is further hereby

ORDERED that intervenor-defendant Citicorp International Trading Company, Inc. remit to the United States of America within thirty (30) days of the date hereof duties equal to the rate provided for under items 427.88 and 901.50, TSUS on any of its entries of fuel ethanol from Brazil at issue in this case which have already been liquidated at a different rate of duty; and it is further

ORDERED, ADJUDGED and DECREED that the defendants' Motion for

---

**137.** November 1, 1985 was the last day of the Service's grace period. Although Citicorp did not formally seek to intervene before the end of this period, it was aware of proceedings herein since at least September 11, 1985 when Mr. Kellogg and its attorney were both present with defendants' counsel during the hearing on the temporary restraining order. *See* transcript of September 11, 1985, p. 4. Mr. Kellogg also addressed the court during the hearing on the preliminary injunction application but chose not to make a formal appearance. *See* Sept. 13 Tr. at 168.

RAJ filed its motion to intervene on September 6, 1985, and it too has been privy to this case from the outset.

Judgment on the Agency Record be, and it hereby is, denied; and it is further

ORDERED, ADJUDGED and DE-CREED that the motions of the defendants and intervenor-defendants for dismissal of the case pursuant to CIT Rule 41(c) be, and they hereby are, denied except as to plaintiffs National Corn Growers Association, New Energy Company of Indiana and Ohio Farm Bureau Federation; and it is further

ORDERED, ADJUDGED and DE-CREED that any other unresolved motions in this case be, and they hereby are, disposed of in accordance with the court's aforesaid decision.